

**SIGNED this 29th day of April, 2010.**

_____
**CRAIG A. GARGOTTA
UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### MIDLAND DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 08-70200-CAG |
| | § | |
| ACM-TEXAS, INC. | § | CHAPTER 7 |
|     Debtor. | § | |

| | | |
|---|---|---|
| TEXAS ARCHITECTURAL | § | |
| AGGREGATE, INC. | § | |
|     Plaintiff, | § | |
| | § | ADV. NO. 08-07012- CAG |
| v. | § | |
| | § | |
| ACM-TEXAS, LLC and APPLIED | § | |
| CHEMICAL MAGNESIAS CORP. | § | |
|     Defendants. | § | |

<u>MEMORANDUM OPINION</u>

On June 29 through July 2, 2009, came on for trial the above-styled and numbered adversary proceeding.[1] After the trial the Court took the matter under advisement. After review of the evidence and arguments, the Court now issues this Memorandum Opinion, as its written findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052, in support of its Judgment entered contemporaneously herewith.

This proceeding includes both core and related claims. This Court has jurisdiction to enter a final order with regard to all matters presently under submission in light of the parties' consent and pursuant to 28 U.S.C. § 1334(a), (b) and (d), 28 U.S.C. § 157(a) and (b), 28 U.S.C. § 151 and the Standing Order of Reference of Bankruptcy Matters entered by the United States District Court for the Western District of Texas. *See* Amended Notice of Removal (docket entry #8) and Defendants' Statement Regarding Core Proceedings Following Removal (docket entry #12).

## I.

### PRE-PETITION HISTORICAL BACKGROUND

The Plaintiff, Texas Architectural Aggregate, Inc. ("TAA") began doing business in 1959, mining for building materials such as limestone in Llano, San Saba and Comanche Counties, Texas. Its primary business is mining and crushing limestone that has metamorphosed into hard limestone or marble. It markets the material as terrazzo, which is used in mosaic flooring, especially in public buildings. The company also mines quartz for use as exposed aggregate exterior wall panels on buildings. Joe Royce Williams, Sr. was the founder and, until

---

[1]On June 6, 2009, the Court entered an order granting the Chapter 7 Trustee's application to employ G. Michael Stewart, as special counsel for the Trustee in this adversary proceeding (Bankruptcy Case No. 08-70200, docket #143).

his death in 2005, the president and chairman of the board of the company.  (Pl.'s Exh. 194, p. TAA-013082.)

In 1963 or 1964, TAA bought the property near the city of Van Horn in Culberson County that is the subject of this suit.  (Pl.'s Exh. 194, p. TAA 013085.)  TAA originally bought 40 acres in fee simple.  In 1982, it was discovered that, because of a surveying error, TAA was actually mining on the State of Texas' land to the east of TAA's 40 acres.  (D. Williams Test. 6/29.)  After the discovery, TAA and the Texas General Land Office ("GLO") reached a resolution of the problem and the State leased the mineral rights on its property to TAA.  That lease, which is not in evidence, prohibited subleasing or partial assignments.  TAA later acquired a lease to the mineral rights on 175 acres to the east of its 40 acres from the State of Texas.  The mineral rights lease, together with the 40 acres TAA owned in fee and the 180 acres it held under mining patents are hereinafter referred to as "Marble Canyon" or the "Property."

TAA built and operated a coal mine on the Property, thirty to sixty feet below the surface. The coal had a significant amount of ash in it, which TAA sold to Kaiser Cement.  TAA also built a plant to remove the sulfur and ash to make limestone.

When Marble Canyon was bought, both the seller and TAA believed it contained a deposit of just white marble.  (D. Williams Test. 6/29.)  TAA intended to, and did, use that marble in its own business.  (Pl.'s Exh. 194, p. TAA 013085; Pl.'s Exh. 194, p. TAA-013086.) In 1964, however, it was determined that the mineral deposit was in fact brucitic marble.  (D. Williams Test. 6/29.)  Reserves were later estimated at more than 10 million tons of ore.  (Pl.'s Exh. 12.)

TAA became interested in developing the brucitic marble deposit for the production of magnesium oxide/magnesium hydroxide as early as 1969. (D. Williams Test. 6/29; Pl.'s Exh. 194, p. TAA013087.)

Robert C. McCreless ("McCreless"), principal of both of the defendants in this suit, approached TAA and proposed that he and TAA come to an arrangement that took advantage of the chemical component of the brucitic marble at the Property. (Pl.'s Exh. 194, p. TAA-013025.)

McCreless' connection with TAA was his father, Robert H. McCreless ("RHM"). RHM had been elected as an alternate director on TAA's board in February of 1976 and four years later he was elected as a regular director. (Pl.'s Exh. 194, pp. TAA-013092, 013094.) In September 1986, McCreless drove RHM and two other directors from Fort Worth, Texas to an emergency board meeting in San Saba, Texas.[2] With permission from the officers of the board, Robert McCreless attended the meeting. After the meeting, McCreless introduced himself to Joe Williams, Sr. and offered to do some market research on brucite for TAA. Joe Williams, Sr., accepted the offer.

The first business entity through which McCreless tried to work with the deposit at Marble Canyon was W&M Mining Interest, Inc. ("W&M"), which was incorporated in the 1980s. W&M entered into letter agreements with TAA, and the board unanimously wanted W&M to pursue a market for the chemical aspect of brucite. To that end, W&M received leases, subleases, and partial assignments from TAA. McCreless pursued W&M for some years.

In 1988, however, the arrangement under the agreement fell apart. The GLO reviewed the 175-acre partial assignment, with respect to the 175 acres TAA leased from the state, and

---

[2] McCreless testified that these three directors later warned McCreless that Joe Williams, Sr. was unethical, and that McCreless should not proceed in doing business with him without first having signed contractual documents.

4

determined that that TAA could not convey a partial lease assignment to W&M. Efforts were made to draft around the dilemma. (Pl.'s Exh. 194, pp. TAA 013074-75 (describing David Williams' meeting with W&M and its attorneys "for the purpose of attempting to gain a clearer understanding of TAA's contractual requirement for conveyance of mineral interests in view of the GLO's demand to review any assignment, including any re-assignment to TAA by W&M" and describing discussions regarding TAA giving W&M an "operating contract on the state lease with option to obtain assignment if production were obtained.")) Ultimately, however, the 1987 agreement between TAA and W&M was abandoned, but not until 1996. (Pl.'s Exh. 194, p. TAA 013079 (showing the board resolving that "the option of W&M Mining Interests, Inc. with the corporation has terminated and is hereby declared to be null and void and that an affidavit to that effect should be placed of record in Culberson County, Texas."))

After the failure of W&M, McCreless continued to develop market applications for brucitic marble. He also began to sell crushed and milled brucitic marble powder to the carpet industry as a fire retardant and filler. For these sales, McCreless purchased the materials from TAA. He also had TAA crush the materials.

At some point, McCreless began looking at acid neutralization in wastewater treatment because the carpet industry needed fewer mineral fillers as fire retardants, due to the Environmental Protection Agency's ("EPA") changing regulations.[3] In late 1997 or early 1998, the Sanitation Districts of Los Angeles County told McCreless they were interested in a second source of magnesium product for their sewer system. This conversation spurred McCreless to

---

[3] McCreless explained in his testimony that when a carpet is newly installed, it releases volatile organic compounds ("VOCs"), which cause the familiar "new carpet smell." In the mid-1990s, the EPA became concerned VOCs could make people working in office buildings with newly installed carpet sick, and that the VOCs might even have carcinogenic effects. In response to new regulations responding to this concern, formulas for carpet backing began to require less capability from mineral fillers, relying more heavily on chemical formulations to achieve what the mineral fillers achieved.

form Applied Chemical Magnesias Corporation ("ACM") in July 1998 as an S-corporation in Colorado.

In 1998, McCreless flew to Texas and told David Williams that he would be getting significant, long-term contracts in the wastewater industry.  The two men discussed structuring another agreement, this time between TAA and the newly-formed ACM.  Phone calls, emails, and other negotiations between McCreless and TAA, primarily through David Williams, culminated in an April 2, 1999 letter agreement ("Letter Agreement").  (Pl.'s Exh. 120.)

The Letter Agreement provides that it is an agreement "for the granting of an exclusive mineral lease to ACM of brucite/calcite/dolomite ("brucitic marble") and the construction of a brucitic marble separation/milling facility at or near the entrance to the referenced Marble Canyon mine owned and operated by TAA on lands ("Subject Lands") described in Exhibit A . . ."  (Pl.'s Exh. 120 at 1.)  The agreement grants ACM a period of six months to conduct a feasibility study to determine whether "the construction of a facility to beneficiate the brucitic marble which would produce a high-purity magnesium hydroxide power for a variety of markets."

After the completion of the feasibility study, the Letter Agreement provides that ACM could elect to give TAA written notice of its intent to "begin construction of a separation/milling facility capable of producing 30,000 tons per year of high-purity $Mg(OH)_2$ powder on the Subject Lands."  Once ACM elected to begin building the facility and paid TAA $5,000, the agreement states that "TAA shall cause recordable leases of mineral and surface rights in the Subject Lands, appropriate to the project contemplated herein, to be delivered to ACM."  (Pl.'s Exh. 120 at 1-2.)  Once the leases were obtained, ACM would have six months to construct the facility.  (Pl.'s Exh. 120 at 2.)

To incentivize production, the Letter Agreement requires ACM to pay TAA $200,000 annually "in advance as royalty beginning twelve (12) months from the date of delivery of its notice to construct a separation/milling facility. . . ." The advance would then be credited to any royalties due to TAA during the following twelve month period. The Letter Agreement also requires ACM to pay royalties "in an amount equal to ten percent (10%) of the gross revenues (excluding sales, use, or excise taxes) paid to ACM for all of the products sold by it from the Marble Canyon properties." (Pl.'s Exh. 120 at 3.)

Under the Letter Agreement, TAA retained the right to mine for its own purposes and agreed not to interfere with the operations of ACM. (Pl.'s Exh. 120 at 2.) ACM promised not to compete with TAA in "any market which TAA is currently supplying without prior written approval of TAA." TAA also promised not to compete with ACM. The parties are in disagreement as to the enforceability of the Letter Agreement and the appropriate interpretation of the Letter Agreement's terms.

From 1999 on, TAA and ACM attempted to reach an agreement that would be acceptable to both parties and would not violate the GLO's prohibition on partial assignment of leases. During these discussions, the parties considered entering into a hard mineral mining agreement. The negotiations took place primarily between McCreless, David Williams, and Samuel McDaniel, the Plaintiff's attorney. On December 4, 1999, McCreless sent TAA an email asking about the status of the conveyances under the Letter Agreement. (Def.'s Exh. 6(a)). On January 5, 2000, David Williams emailed McCreless and informed him that instead of a mineral rights lease, TAA wanted to enter into a Hard Mineral Mining Agreement ("HMMA") and a document that leased ACM 40 acres for the mill site. (Def.'s Exh. 6(b)). On February 4, 2000, McCreless emailed back and stated, "it appears to us that the Hard Mineral Mining Agreement

(HMMA) document does not reflect the intent of the Letter of Agreement . . . ." (Def.'s Exh. 6(c)). McCreless was concerned that the Letter Agreement contemplated an "exclusive mineral lease to ACM," while the HMMA conveyed a non-exclusive right. He also expressed concern that the "tone of the HMMA does not reflect an attitude that was present in the original W&M lease documents (from which I assumed would be the standard to work.)" David Williams responded that they needed to avoid a mineral lease because of the GLO's stance on partial assignments, which caused the failure of the W&M project. (Def.'s Exh. 6(d)). David Williams and McCreless continued to discuss the problem, but never reached agreement on the terms of the HMMA or ACM's right to exclusive mineral leases. Nevertheless, on November 21, 2000, ACM and TAA entered into the Mine Mill Site Lease ("Lease"). (Pl.'s Exh. 102.) The Lease conveys a lease interest in the west half of the forty acres that TAA owns in fee simple. This ground lease is the only lease ACM received from TAA.

Specifically, the Lease states that TAA grants ACM "the exclusive right, in association with other certain agreements between the parties hereto of equal date herewith, to establish a processing mill for the purpose of on-site processing of brucitic marble and associated substances, on the west one-half (W1/2) of a certain 40 acre tract of land situation in Culberson County Texas . . . ." (Pl.'s Exh. 102 at 1.) The Lease then describes the exact location of the leased land by metes and bounds. The Lease provides that it will last for 20 years and could continue for another 20 years at the option of ACM, so long as ACM had not breached the Lease. (Pl.'s Exh. 102 at 2.)

As consideration, the Lease requires ACM to pay $600 for rent annually during the first five years. The Lease also provides that on December 28, 2004, the annual rent would be subject to "increase for the next five (5) year term in accordance with changes in the United States

Consumer Price Index for Urban Wage Earners and Clerical Workers . . . ."  Under the Lease, rent would be re-evaluated for each successive five year period.

The parties continue to negotiate.  During the negotiations, TAA pushed for a HMMA and ACM continued to request conveyance of the mineral leases that McCreless contended were required by the Letter Agreement.  (Def.'s Exh. 13(d) (letter from McDaniel stating, "An exclusive mineral lease to ACM and recordable leases of mineral and surface rights are a problem because of the policies of the State of Texas and the issue of control.")  In March 2001, on the advice of CPAs and attorneys, McCreless formed ACM-Texas, LLC ("ACM-Texas") as a wholly-owned subsidiary of ACM, and began selling membership units to raise capital to allow further market research.  (*See* Pl.'s Exh. 248, p. 013244-45.)  McCreless testified that the total amount of capital and loans raised between ACM and ACM-Texas was roughly $10,000,000 over ten years.

At some point, the relationship between TAA and ACM deteriorated.  In 2002, Sam McDaniel, acting as TAA's counsel, communicated to McCreless that the legal enforceability of the Letter Agreement was questionable.  In June of 2002, Joe Williams, Sr. sent McCreless a fax instructing him not to bring a drill to Marble Canyon.  (Pl.'s Exh. 178.)  McCreless continued to ask for recordable leases per the Letter Agreement.  TAA and ACM continued to negotiate, but on August 7, 2003, TAA returned a royalty check submitted by ACM and stated that there was no viable agreement between ACM and TAA.  (Def.'s Exh. 17.)  The next month, ACM's attorney, Douglas M. Dumler, sent a letter to TAA demanding the recordable leases as per the 1999 Letter Agreement.  (Pl.'s Exh. 118.)

From that point on both parties proceeded to seek relief from various courts.  First, ACM filed a complaint for re-entry before the Culbertson County Justice of the Peace, Precinct

Number Three.  The complaint is not in evidence.  On April 28, 2004, the Justice of the Peace ordered TAA to "provide immediate and temporary possession of the premises identified in the Mine Mill Site Lease . . . to ACM."  The Order also notified TAA that it had a right to a hearing on ACM's sworn complaint for re-entry.  (Def.'s Exh. 24.)  Whether or not the hearing was conducted is unknown, as the information is not in evidence.  Next, on December 14, 2005, the Judge in Culberson County entered a Temporary Restraining Order against TAA after hearing ACM's Sworn Petition for Injunctive Relief.  The Petition for Injunctive Relief is not in evidence.  The Court ordered that TAA provide ACM with immediate possession of the Mine Mill Site Lease property, refrain from blocking access to the Mine Mill Site Lease property, and refrain from blocking access to the Marble Canyon property.  (Def.'s Exh. 25.)

On December 20, 2005, TAA filed suit against ACM in the District Court of Culberson County, Texas.  On April 5, 2006, the District Court granted TAA's Petition for Permanent Injunction and enjoined ACM from removing any brucitic marble mined or shot by TAA.  (Def.'s Exh 26.)

On July 31, 2007, the United States Department of Labor, Mine Safety and Health Administration ("MSHA") issued citations to both ACM and TAA which stated, "[t]he civil dispute taking place at this mining operation has resulted in imminent danger to mining personnel employed by the two separate mine operators currently reporting employee man hours to MSHA at this underground mine.  The mine operators are engaged in disagreement regarding their individual rights to mine at this property resulting in tactics that could lead to employee injury."  (Pl.'s Exh. 317.)  Both levels of the underground mine were closed until the order was lifted on January 26, 2009.  (Pl.'s Exh. 318.)

On November 1, 2007, the District Court entered an order enjoining TAA from placing barriers across the entrances to the lower portals of the mine to bar access to ACM. The Court further enjoined TAA from placing barriers on ACM's leased property. (Def.'s Exh. 27.)

On February 5, 2008, MSHA again issued a citation to TAA finding that it set off a blast on January 29, 2008 that caused "fly rock" to damage ACM's building and the windshield of ACM's drill. (Pl.'s Exh. 315.) It also found that ACM's employees were in the building at the time it was punctured by the fly rock. The citation was later vacated because ACM's miners were warned that TAA was prepared to blast and did not leave the area. (Pl.'s Exh. 316.)

On July 24, 2008, TAA filed an Amended Complaint for Forcible Detainer. (Pl.'s Exh. 320.) In its Complaint, TAA argued that it has not cashed any of ACM's $600 rental checks since January 1, 2003. Under the terms of the Mine Mill Site Lease, ACM was to pay TAA $600 a year in rent in exchange for the lease of the west half of TAA's 40 acres. (Def.'s Exh. 10, ¶ 3.) Paragraph three of the lease also included a clause that allowed for an increase in rent for the five year term following December 28, 2004. TAA stated that in August of 2005, it notified ACM that the $600 payment was not sufficient under the terms of the lease and that TAA cancelled the lease for non-payment of rent. Then, in August of 2006, TAA gave ACM notice to vacate the leased premises. ACM did not move out. TAA asked the District Court to find ACM guilty of forcible detainer and grant TAA a writ of possession. ACM filed an answer generally denying the allegations in the forcible detainer complaint, but did not appear at the hearing on the complaint. On December 8, 2008, ACM-Texas filed its bankruptcy petition in this Court. In March of 2009, the District Court found in favor of the TAA on its Forcible Detainer Complaint and ordered that ACM give TAA possession of the leased premises and pay restitution in the amount of $2,438.38 plus court costs. (Pl.'s Exh. 323.)

## II.

### PARTIES CONTENTIONS

Summarized below are the numerous claims and counter-claims asserted by TAA and ACM. In its Fifth Amended Petition, TAA plead the following causes of action: (1) lack of contract/breach of contract; (2) fraud; (3) unjust enrichment; (4) accounting and damages; (5) conversion; (6) trespass; (7) tortious interference; (8) negligence; and (9) TAA asks for a declaratory judgment regarding the rights, status and legal relations under the April 2, 1999 Letter Agreement.

Specifically, TAA first contends that the April 1999 Letter Agreement is not a contract or, in the alternative, that if it is a contract then ACM breached that contract. TAA argues the Letter Agreement does not contain all the essential elements required for a mineral lease. TAA also contends the Letter Agreement is void as it is an agreement to make an agreement and therefore not enforceable. In the alternative, TAA argues ACM did not follow the requirements of the Letter Agreement and therefore breached the agreement. The Letter Agreement required ACM to give information regarding an economic feasibility study to TAA. TAA argues that ACM never delivered that information. TAA contends that the Letter Agreement contemplated the creation of a "separation/milling facility" that beneficiates and separates brucitic marble and the facility ACM created did not beneficiate or separate the brucitic marble. The Letter Agreement required ACM to pay $200,000 annually as an advance royalty which TAA argues ACM never paid. TAA also argues that ACM violated the provision in the Letter Agreement that disallowed ACM from competing in the same markets as TAA. Finally, TAA argues that if the Letter Agreement is a contract, ACM breached it because of a failure of consideration in that

ACM did not separate or beneficiate the brucitic marble as was required under the Letter Agreement.

Second, TAA argues that the Letter Agreement was procured both by common law and statutory fraud. TAA argues that McCreless, represented to Joe Williams, Sr. that ACM would separate and beneficiate brucitic marble. TAA argues this was a false, material statement, and ACM either knew the statement was false or made the representation recklessly without knowledge of its truth. TAA argues ACM made the statement with the intent that TAA would rely on the false statement and that TAA relied on the statement by signing the Letter Agreement. TAA contends the resulting fraud gave ACM access to TAA's property, and ACM used this access to take roughly $10,000,000 worth of brucitic marble from TAA and to interfere with TAA's use of its own property. TAA alleges this interference resulted in great expense, loss of business, and other damages totaling approximately $500,000.

Third, TAA argues it should be entitled to recover money from ACM under the theory of money had and received or under the theory of unjust enrichment. TAA alleges ACM took TAA's property, the brucitic marble, and then sold it. TAA argues that because brucitic marble was owned by TAA, the money from its sale should rightfully be TAA's. TAA alleges the total value of all the property sold was approximately $8,806,501.70.

Fourth, TAA argues that ACM had no contractual right to mine but, nevertheless, has done so. TAA argues that if the Letter Agreement is held to be a contract, and is also held to grant ACM the right to mine, then TAA is owed the $200,000 advance annual royalty and the amount of the additional actual royalty required under the Letter Agreement. In order to determine the amount of the actual royalty, TAA argues it is entitled to an accounting of all brucitic marble shipped by ACM from the mine in Culberson County, Texas.

Fifth, TAA alleges ACM used its rights under the Mine Mill Site Lease to take the marble mined by TAA. This taking, argues TAA, was a conversion of its property. Specifically, TAA alleges it owned or had legal posession of the property, ACM took control over TAA's property to the exclusion of TAA's rights in the property, TAA demanded return of the property, ACM refused to return the property and finally, ACM's acts manifested a clear repudiation of TAA's rights. TAA also alleges the conversion was done with malice, and therefore TAA should be entitled to exemplary damages. TAA alleges the total amount of material taken has a fair market value greater than $158,400 and that TAA should not recover less than the actual amount for which the converted material was sold. TAA argues that because the injuries are continuing and the property involved is unique and irreplaceable, it will be impossible to measure the damages in monetary terms. Therefore, TAA argues it has no remedy at law and asks the court to permanently enjoin ACM from moving any material mined by TAA, and requests that all materials be returned.

Sixth, TAA alleges that since June of 2002 there was a disagreement over the rights ACM had in the property. TAA alleges that ACM knew TAA did not agree that ACM had a right to mine. TAA claims that despite this knowledge, ACM chose to act at its peril and mined without a lease or permission to do so. TAA argues that ACM's mining was a trespass against its property.

Seventh, TAA argues that it had a contract with the GLO regarding the lease in Culberson County. TAA alleges ACM willfully and intentionally interfered with that contract by showing the GLO that ACM mined thousands of tons of material from the land without paying royalties. TAA alleges the amount reported was inflated to impose a higher royalty payment

onto TAA. The goal of this, TAA argues, was to get the GLO to terminate the lease with TAA, in the hopes the GLO would later lease the land to ACM.

Eighth, TAA argues that ACM negligently, grossly negligently, maliciously, and with intent to harm, caused MSHA to close TAA's underground mine. TAA first argues ACM had no right to be in the mine, had no MSHA approved plan to mine underground, and that ACM did not have personnel qualified to work on the underground mine. TAA next alleges ACM drilled holes in the mine and then set off explosives which broke up the brucitic marble and caused MSHA to close the mine. TAA contends that from July 31, 2007 onward, TAA has been unable to access the mine to either mine brucite or to get the material TAA previously stored in the mine. TAA alleges this caused lost business and increased expenses which totaled $500,000.

Lastly, TAA asks for a declaratory judgment to determine the rights of both parties under the Letter Agreement. TAA contends that both parties have done some things envisioned under the Letter Agreement but have also chosen not to do some things required by the Letter Agreement. TAA argues that the agreements made between 1999 and 2003, to jointly work on the mineral deposits, are distinct from the Letter Agreement and that both parties have largely abandoned the Letter Agreement.

In its Second Amended Original Answer, ACM counter-claimed: (1) breach of contract; (2) breach of mine mill site lease; (3) tortious interference with property rights; (4) wrongful eviction; (5) fradulent misrepresentation and inducement; (6) fraud by non-disclosure; (7) detrimental reliance/promissory estoppel; (8) trespass/misappropriation of business information; (9) theft; (10) trespass by TAA onto defendant's property; 11) theft of defendant's mineral property; 12) specific performance; 13) credit and or offset; 14) ACM asks the court to enjoin

TAA from harming employees and equipment; and 15) ACM asks the court to enter a declaratory judgment establishing its mineral, surface, and leasehold rights at Marble Canyon.

First, ACM alleges the Letter Agreement was a contract that granted ACM an exclusive mineral lease for brucitic marble and the right to construct a brucitic marble separation/milling facility in Marble Canyon. ACM alleges TAA materially breached the contract by repeatedly prohibiting ACM from fully utilizing its mineral rights. ACM also alleges TAA breached the contract by not providing the recordable leases required by the Letter Agreement. ACM argues this caused, and continues to cause, ACM substantial monetary damages. ACM requests both monetary damages for the breach and specific performance of the Letter Agreement.

Second, ACM alleges TAA materially breached the Mine Mill Site Lease by repeatedly interfering with ACM's property rights. ACM contends TAA prohibited ACM from accessing and using the leased property and this, and other interferences, caused ACM to incur monetary damages.

Third, ACM argues TAA materially and tortiously interfered with ACM's property rights regarding the Lease. TAA has already been temporarily enjoined from disallowing ACM access to the leased property. ACM also argues that the forcible detainer action was an attempt by TAA to wrongfully seize possession of the leased property.

Fourth, ACM contends the interference by TAA with access to property leased to ACM under the Lease constitutes a constructive eviction of ACM. ACM also alleges that this is a wrongful eviction, and has caused ACM to incur substantial damages, legal expenses, and interfered with ACM's ongoing business.

Fifth, ACM alleges TAA fraudulently induced ACM to enter into the Letter Agreement. ACM argues TAA materially misrepresented its ability and intentions to cause recordable leases

of mineral and surface rights to be delivered to ACM as required by the Letter Agreement.  ACM alleges each of TAA's representations was material, false, and that TAA knew they were false. In the alternative, ACM alleges TAA made the representations recklessly as a positive assertion without knowledge of the truth.  ACM also alleges TAA made the representations with the intent that ACM rely and act upon the representations.  ACM alleges the reliance was reasonable, and this reliance proximately caused ACM significant damages as well as potential exposure to additional damages from ACM's numerous clients.

Sixth, ACM alleges that TAA failed to disclose material facts regarding TAA's inability or lack of intent to cause recordable leases required by the Letter Agreement to be delivered to ACM.  TAA had a duty to disclose this information because, ACM argues, TAA knew that ACM was ignorant of material facts as TAA purposely misled and expressly misrepresented its intent and ability to convey the leases.  ACM argues it did not have an equal opportunity to discover the truth as TAA failed to disclose it, and took affirmative steps to conceal the material information.  ACM alleges TAA intended to induce ACM to enter into the Letter Agreement and the Lease and that ACM relied on the nondisclosure and was injured as a result.

Seventh, ACM alleges it relied on the promises contained in the Letter Agreement, the Lease, and TAA's initial actions in conformity with those documents.  ACM argues it took reasonable and foreseeable stops consistent with those agreements.  These steps included development of the mill, hiring employees, entering into business agreements, and raising capital.  ACM argues that as a result of its reliance on TAA's promises, it has suffered recoverable injuries.

Eighth, ACM claims TAA trespassed onto ACM's property as part of an attempt to take ACM's confidential or proprietary business information.  ACM alleges it had a right to the real

property, TAA entered into ACM's property, the entry was intentional, and that the trespass caused injury and actual damage.

Ninth, ACM alleges that Andrew Speyrer ("Speyrer"), a onetime business associate of ACM, acting at the behest of TAA examined and/or removed ACM's business records. ACM alleges the information was invaluable and that TAA could profit from receiving this information. ACM claims it would be difficult, if not impossible, for TAA to duplicate the information independently. ACM also raises a trespass claim as it alleges the property Mr. Spreyer entered was lawfully owned by ACM.

Tenth, ACM alleges that while ACM and TAA were operating in Marble Canyon, TAA took brucitic marble stockpiles owned by ACM. ACM alleges the mineral was taken without permission or compensation. ACM claims that TAA's wrongful exercise of dominion over the marble caused ACM to suffer economic damages totaling the lost value of the converted marble.

Eleventh, ACM requests specific performance to the Letter Agreement, including conveyance of recordable leases as well as unfettered access to ACM's mining/milling plant. ACM also alleges it is entitled to specific performance under the mine mill site lease.

Twelfth, ACM prays for an offset to TAA's alleged damages for the fair market value of the material belonging to ACM and used by TAA. ACM also asks for an offset of TAA's damages equal to the amount of ACM's damages proximately caused by TAA.

Thirteenth, ACM requests the court to enjoin TAA from mining, blasting, or doing anything that creates any life threatening conditions. ACM claims that TAA mined and blasted fully aware that these activities would cause debris to shower ACM's property and personal. ACM alleges this created numerous holes in its property. ACM alleges these actions caused

irreparable harm and created a risk of injury or death.  Because these dangers are not easily measured, ACM claims it is therefore entitled to injunctive relief.

Finally, ACM requests declaratory relief to validate the Letter Agreement between TAA and ACM, and to validate the 20-year Mine Mill Site Lease.  It also alleges TAA has a duty to provide recordable leases as envisioned under the Letter Agreement and a duty not to interfere with the leasehold conveyed to ACM under the Lease.

The Court notes that ACM's civil conspiracy claim was dismissed upon TAA's 52(c) Motion for Summary Judgment because the Court found the evidence could not show a meeting of the minds between Andrew Speyrer and any agent of TAA.

## III.

### PROCEDURAL HISTORY OF THE ADVERSARY PROCEEDING

As previously mentioned, ACM-Texas, one of the defendants and counter-plaintiffs in the aforementioned suit, filed for Chapter 11 bankruptcy relief pursuant to Title 11, United States Bankruptcy Code -- *In re: ACM-Texas, LLC*, Case No. 08-70200.  The case was converted from a Chapter 11 to a Chapter 7 proceeding on December 17, 2008.  On December 11, 2008, TAA requested that the suit be removed from the 205th District Court for Culberson County, Texas and transferred to the Bankruptcy Court for the Western District of Texas, pursuant to 28 U.S.C. § 1452(a), Fed. R. Bank. P. 9027 and Local R. Bank. P. 9027.  The proceeding thus came under the jurisdiction of the Bankruptcy Court for the Western District of Texas as an adversary proceeding.

On February 24, 2009, TAA filed a Motion for Partial Summary Judgment and asked the Court to find that the April 2, 1999 Letter Agreement is not an enforceable contract.  On June 9, 2009, the Court issued its Memorandum Opinion In Support of Order Granting in Part, and

Denying in Part, Plaintiff's Motion for Summary Judgment.  In the Memorandum and Order, the Court denied summary judgment as to the enforceability of the April 2, 1999 letter, but found that Defendants' counterclaims for breach of contract and for specific performance of the April 2, 1999 letter, including any defensive use of those claims, to be time-barred.  It further denied summary judgment as to the Plaintiff's statute of limitations defense as to all other counterclaims.

## IV.

### EVIDENCE PRESENTED AT TRIAL

Summarized below are the portions of testimony and exhibits that the Court found most relevant to the issues of fact, claims, and counter-claims raised by each party.

David Williams.  David Williams has been on the board of TAA since 1975, was chairman since February 2005, and was secretary from 1986 until at least the date of the trial. David Williams and Joe Williams, Jr. are the sons of Joe Williams, Sr., the founder of TAA.

According to David Williams' testimony, TAA recognized the value of producing magnesium oxide at the time the deposit of brucitic marble at Marble Canyon was identified, and TAA became interested in developing the deposit for the production of magnesium oxide/magnesium hydroxide as early as 1969.  (Pl.'s Exh. 194, p. TAA013087.)  David Williams explained that from 1969 through 1986, TAA was involved in research regarding methods of extracting magnesium oxide from brucitic marble and the feasibility of commercial production from the Marble Canyon Mine through various research institutions, metallurgists, and engineering firms.  (D. Williams Test. 6/29; Pl.'s Exh. 49; Pl.'s Exh. 50; Pl.'s Exh. 54; *see also* Pl.'s Exh. 194, pp. TAA-013023.)

According to David Williams, through the mid-1960s the only way magnesium hydroxide had been extracted from brucitic marble was through calcining. (D. Williams Test. 6/29.) David Williams seemed to indicate in his testimony that the principal reason TAA began working with McCreless was to separate the brucitic marble. David Williams testified that McCreless, through his company W&M Mining Interests, Inc. ("W&M"), proposed to lease the Marble Canyon Mine from TAA for the purpose of producing magnesium oxide by using "heavy medium separation," a method that had been used in other mineral production, but never for extracting magnesium oxide. (D. Williams Test. 6/29; Pl.'s Exh. 194, p. TAA-013035.)

In April of 1987, TAA made a counter proposal to W&M's proposal to lease. (Pl.'s Exh. 194, p. TAA-013037.) The draft counter-proposal provided that, when accepted by W&M, it would be a "Letter of Engagement." The proposal's subject matter was described as "the investigation by W&M into and the leasing and subleasing by TAA to W&M of the lands . . . described in" an exhibit, which was not attached to the document nor, to the Court's knowledge, otherwise introduced into evidence. In summary, W&M was to "undertake to investigate and explore the feasibility of liberating magnesium hydroxide, caustic magnesium oxide, magnesium oxide and other magnesium products from brucitic limestone in the Subject Lands, and, after such studies, if [W&M] desire[d] to continue the project, to develop a magnesium separation system, including mining, milling, separation and marketing of the magnesiums and by-products . . . of the mining and separation processes . . . ." There was to be a six month feasibility period, and within thirty days after the end of that period, W&M was to "give TAA written notice of whether or not [it] desire[d] to obtain an exclusive working interest covering magnesium . . . in recordable form . . . covering so much of the Subject Lands as W&M shall

21

have specified in its notice."  In exchange for that working interest, W&M was to pay TAA $10,000.  (Pl.'s Exh. 194, pp. TAA-013040-41.)

The TAA draft proposal led to another presumably similar one, not in evidence, under which the parties apparently proceeded because W&M engaged "a noted metallurgical engineer and magnesium expert," and reported to TAA that he recommended a process "of heavy liquid separation followed by calcining of the MgOH."   (D. Williams Test. 6/29; Pl.'s Exh. 194, p. TAA-013049.)   W&M also reported to TAA that "results so far show an average of 97% beneficiation of the VanHorn deposit and [its] preliminary investigation shows a $3.06/ton separation cost . . . and a $12.50/ton BTU cost for calcining the beneficiated portion."   (Pl.'s Exh. 194, p. TAA-013050.)   Although expressing some concern over whether the by-product of the process, which would contain small amounts of impurities, could be used because of the "highly toxic agents it would contain," TAA nevertheless expressed its general satisfaction with W&M's progress and results, pronouncing that the proposed beneficiation process "will satisfy the board for purposes of the six month investigation if W&M pursues this direction with the pilot study."

Williams testified that the relationship with W&M ended because the GLO's requirement of an absolute conveyance of TAA's interest in the 175 acres would mean TAA and W&M would essentially be operating on the land as a joint venture.  This was not acceptable to TAA because TAA did not want to lose control of its Marble Canyon operations which constituted 60% of its business.  (D. Williams Test. 6.29.)  David Williams testified that a release, not in evidence, was actually executed by W&M in connection with the termination of the agreement.

In regard to the intent to build a separation facility, Williams testified that McCreless shared at least some information about his efforts researching and developing markets for

magnesium hydroxide to be produced from the Marble Canyon Mine. For example, in December of 1988, McCreless sent David Williams lists of competing products, samples of carpet in which magnesium hydroxide was used as a fire retardant or smoke suppressant, an analysis of that market, and other information on other markets such as magnesium oxide or magnesium hydroxide as an ingredient in cattle feed and paint. (Pl.'s Exhs. 5-8.)

In November of 1989, McCreless wrote a memorandum to TAA again regarding the market for use in carpets, noting that a producer of a competing product was undercutting his price (TAA at this time was selling brucitic marble to McCreless for use in carpets) and therefore "it has been much tougher sledding than we first thought." (D. Williams Test. 6/29; Pl.'s Exh. 9.) About that same time, McCreless also discussed with TAA a market for using "higher purity $Mg(OH)_2$ in the industrial waste water/acid neutralization markets" (sewage treatment), noting that those "markets continue to show promise" and that they "could turn out to be our largest market for separated brucite . . . ." (Pl.'s Exh. 10.) In conducting that research, McCreless used material from a deposit he had in Arizona, and indicated that he was attempting to reduce the particle size to one more effective.

Also included in the materials presented to TAA by McCreless is an undated memo providing "Technical Data" on a product referred to as "HMR 93." (Pl.'s Exh. 10, p. TAA 00110.) David Williams testified that this referred to a product that would be 93% pure magnesium oxide, and that this document implied that McCreless would be separating the brucite to that purity. David Williams also indicated in his testimony that the flow sheet attached to the January 20, 2000 letter to Joe Williams from Bobby McCreless appears to describe a separation process. Williams agreed with his counsel that this indicates a separation process was

still in discussion at this time in early 2000.  To David Williams' knowledge, there was never any high purity magnesium hydroxide produced at Marble Canyon.

According to David Williams, separation as an objective of the agreement "went out of the picture" at a 2001 meeting with McCreless, when it was suggested that no separation would take place.  David Williams admitted at trial that the parties continued to negotiate after 2002, but not to fulfill the objectives of the Letter Agreement because by 2001 it was understood that McCreless was not separating the brucitic marble.  Although this was understood, TAA was willing to consider working out an arrangement with ACM because McCreless' father had been a board member of TAA, and because McCreless had threatened to sue TAA with "the mother of all lawsuits" and bankrupt TAA.  Additionally, David Williams admits that the relationship between the two parties had "an amicable beginning" and that from 1999 to 2003, TAA allowed ACM to be on the Marble Canyon property while the parties worked on an agreement.

When testifying about the enforceability of the 1999 Letter Agreement, David Williams acknowledged that McCreless consistently represented that he thought the Letter Agreement was a binding document, but found its terms ambiguous and wanted to draft a new agreement.  David Williams testified that there was no indication in the Letter Agreement as to what specific lands would be given.  In 2002, Sam McDaniel, TAA's attorney, sent a letter to McCreless indicating that there was uncertainty as to the validity and enforceability of the 1999 Letter Agreement.  David Williams testified that by the time McDaniel had sent this letter, he had already indicated to McCreless that the Letter Agreement was legally unenforceable.  David Williams likewise indicated that the fax sent by his father in 2003, which instructed McCreless not to bring a drill to Marble Canyon, was intended to indicate that there was no agreement between the parties and that the email/fax was an attempt to get ACM-Texas to leave the Property.  Williams also

testified that the reason TAA took no further actions before filing this lawsuit in Culberson County Court was that the Courts had issued injunctions maintaining the status quo until the matter could be decided in Court, and did not allow any further actions to be taken.

As to the unpaid and underpaid GLO royalties TAA seeks from ACM and ACM-Texas, David Williams testified that TAA is not seeking GLO royalties from ACM and ACM-Texas pursuant to the Letter Agreement or any other agreement.  Instead, Williams testified that TAA is entitled to royalty payments from ACM as a matter of law.  In fact, David Williams testified that the $200,000 figure was "pulled out of thin air," and did not reference any prior agreement. Williams does admit, however, that there were discussions following the Letter Agreement as to how to pay royalties to the GLO, but stated that the parties never reached a resolution.

Williams testified that royalty checks were tendered to TAA by ACM-Texas, but maintained that TAA did not cash or deposit the checks.  He acknowledged, however, that TAA at some point paid royalties directly to the GLO.  David Williams testified that the GLO performed a 2005 audit that indicated the royalties due the GLO for materials mined and sold by ACM/ACM-Texas were unpaid or underpaid.  According to David Williams, the audit revealed that ACM was paying $0.67 per ton, instead of paying the appropriate percentage of the market value of the rock.  Williams testified that TAA was unable to pay GLO the royalties it was due because TAA did not know at what price ACM was marketing its materials, and because ACM had ceased paying TAA sales commissions on the rock it sold.

Louise Williams. Louise Williams is Joe Williams, Sr.'s widow and mother to David Williams and Joe Williams, Jr.  She testified that she has been active in the business of TAA since its inception. She presides over the bookkeeping, billing, and shipping from TAA's San Saba office.  She testified to explain how TAA calculated the damages ACM owed TAA for

TAA's crushing services between September 1, 2000 and July 1, 2001. (*See generally* Pl.'s Exh. 336 (invoices for ACM's open account with TAA.)) Louise Williams testified that McCreless asked to be billed at $6.00 per ton of rock crushed. (*See also* Pl's Exh. 131.) Ms. Williams testified that, originally, TAA billed McCreless at this rate. Joe Williams, Sr., however, informed Ms. Williams that this was not the proper rate. The amounts McCreless paid at the rate of $6.00 per ton of material crushed were then credited to his balance, and McCreless was charged for the loading, transporting, labor, preparation, and crushing costs that were necessary to crush McCreless's materials on a cost-plus basis. (Pl's Exh. 336, p. TAA0013576.) A cost-plus basis calculates overhead and profit, which is calculated as a percentage of the hourly rates for labor and use of equipment. Ms. Williams testified that TAA only rented out its equipment, including its crusher, loader, bagger, and other equipment, for custom crushing jobs on a cost-plus basis. The hours of labor and hours of machine use were recorded by the mining engineer who faxed them to Ms. Williams' office weekly. The unit price for labor was determined from the payroll. The unit price for use of the machines was determined by using the monthly rates from Sierra Machinery, Inc. for a particular machine, and then divided into hourly rates. Ms. Williams testified that McCreless was only charged for the time used.

Louise Williams admits that there was some controversy or disagreement as to the invoices sent to McCreless by her office in San Saba. McCreless originally asked Ms. Williams to bill him at a rate of $6.00 per ton. (Pl.'s Exh. 131.) Upon Joe Williams' instruction, Ms. Williams corrected his balance to reflect billing on a cost-plus basis, with a 15% rate for profit and overhead. Upon McCreless's complaints, TAA lowered the rate for profit and overhead to 10%. Ms. Williams testified that McCreless eventually agreed to be billed for equipment and

labor on a cost-plus basis, but that he disputed the invoices he received. There is no written agreement pertaining to these transactions.

Additionally, Ms. Williams testified that McCreless owed TAA the cost of repair to a Tamrock drill, which was repaired upon request. Ms. Williams testified that McCreless asked several times that the cost of the repair be billed to him. (*See* Pl.'s Exh. 129 (email from McCreless to Joe Williams regarding ACM paying to have TAA's drill refurbished, dated April 22, 2000.))

Joe Royce Williams, Jr. Joe Williams, Jr. is the President, CEO, and General Manager of TAA, as well as the son of its founder Joe Williams, Sr. In the 1970s, he designed and oversaw the construction of a fines mill at TAA's Burnet operation. After building the mill, he stayed in Burnet to operate the Bilbrogh Marble Division, a wholly-owned subsidiary of TAA. In December, 2004 at a stockholder's meeting, Joe Williams, Jr. became the president and CEO of TAA. His father passed away the following February. Before coming to the Marble Canyon mine in 2005 to oversee operations, Joe Williams, Jr. had visited the property several times to load shot rock.

At trial, Joe Williams, Jr. testified to McCreless's failure to meet the provisions of the 1999 Letter Agreement. According to Joe Williams, Jr.'s testimony, McCreless did not live up to his obligations under the Letter Agreement. Specifically, Joe Williams, Jr. testified that in 2001, he became aware that ACM was competing with TAA, in violation of the Letter Agreement, when Third Coast Imports, Inc. contacted Joe Williams, Jr., asking for a better price on a brucitic marble pool mix ACM was marketing. Joe Williams, Jr. testified that TAA was also already engaged in selling pool mix.

27

Additionally, Joe Williams, Jr. testified regarding the issue of separation or beneficiation of the brucitic marble mined at Marble Canyon.  According to his testimony, ACM's equipment at TAA's Marble Canyon plant could make mined materials smaller but could not separate brucite from calcium carbonate.

As to the issue of whether ACM converted material mined by TAA, Joe Williams, Jr. testified that he was informed by Manuel Baeza, TAA's mining foreman at Marble Canyon, that ACM was taking TAA's rock from its stockpiles.  When TAA contacted the local sheriff, however, it had trouble convincing the sheriff which rock belonged to TAA because they were not visually distinct.  To solve this problem, Joe Williams, Jr. testified that he purchased a GPS unit for Baeza to operate.  According to his testimony, Joe Williams, Jr. helped Baeza log and document all of TAA's stockpiles at Marble Canyon, using the GPS unit to locate the stockpiles. Joe Williams, Jr. testified that he relied on Baeza to locate TAA's stockpiles when he came to Marble Canyon in 2005.  For information about TAA's stockpiles before 2005, he relied on S. K. Choudhury's records.  While Joe Williams Jr. admitted to not knowing where ACM placed or kept its materials, he testified that he had seen ACM stockpiles around ACM's mill site on both sides of the road.  (Pl.'s Exh. 195 (Manuel Baeza's field notes.))

Joe Williams, Jr. testified about an additional harm caused by ACM's actions, the hole ACM allegedly created in the floor of TAA's underground mine on July 16, 2007.  (*See* Pl.'s Exh. 218 (maps showing upper and lower levels of mine from 2005 survey.))  According to this testimony, the large hole precluded traffic in the mine and impacted the ability of TAA's miners to advance to lower levels of the mine.  Joe Williams, Jr. testified that TAA incurred $10,500 of expenses mucking out and cleaning up the hole.  Additionally, he testified that repairing the mine will cost TAA two weeks of labor, valued at $20,000, and 750 yards of Diablo White material,

which costs $50.00 per ton, for a total of $27,000.  (*See* Def.'s Exh. 35 (TAA price lists show price of Diablo White as $6.60 per 100-pound bag.))  Thus, according to Joe Williams, Jr.'s testimony, repairing the mine will cost TAA another $47,000.  Joe Williams, Jr. also testified that when ACM created this hole, ACM removed 1,098 tons of material from TAA's underground mine.  Joe Williams, Jr. did not testify to the value of this material.  Joe Williams, Jr. also testified that the explosion creating the hole came at a critical time for TAA because TAA was in the process of fulfilling a large order for Jet Blue Airlines.  He testified that TAA had at least 45,000 pounds of Sierra White to be mined and delivered to Jet Blue when ACM created a hole in the floor of the mine.  Plaintiff's exhibit 226, regarding the Jet Blue deal, was not admitted at trial.

As to TAA's 2008 blasting that ACM claims damaged its buildings and equipment, Joe Williams, Jr. testified that TAA's mine foreman, Manuel Baeza, reported the blasting incident to MSHA, who was at Marble Canyon within twenty minutes.  Joe Williams, Jr. also testified that he called the insurance company to put them on notice of possible claims of harm to ACM's property resulting from TAA's blasting.

Drake Johnson.  Drake Johnson is an attorney living in Fort Hood, Colorado who was a business associate of ACM, acting as legal counsel, salesman, and board member to ACM.  (*See* Pl.'s References to Evidence Exh. 34.)

Johnson met McCreless socially in Colorado shortly after graduating law school in 1989.  In the spring of 1999, McCreless approached Johnson about working for him.  Specifically, McCreless offered to pay Johnson a finder's fee for any investors for a company that would mine brucite and sell it within the wastewater industry, which Johnson viewed as a recession-proof industry.  Johnson, as well as his parents, sisters, parents-in-law, and friends, invested in

McCreless's young business.  In fact, Johnson testified that he knew of $1,600,000 invested in ACM by investors in Fort Collins, Colorado.  In the fall of 1999, Johnson began employment as a part-time salesperson to sell the calcium carbonate that would be produced in a separation process which would isolate magnesium hydroxide.  He stopped working for ACM in April or May, 2001 and left the Board in September 2001 when his term expired.

Johnson testified that he had personally visited the Marble Canyon mining site.  Johnson also testified that McCreless represented to Johnson that there would be a separation process of the brucitic marble mined at Marble Canyon, which would be put in place after a machine was purchased from Separation Technologies Inc.[4] at a price of $1,000,000.  Johnson testified that McCreless represented to him that ACM planned to purchase the separation machine in early 2000 and then install it in Texas. According to Johnson's testimony, however, a separation process was never put in place during his time with ACM.  He testified that in a President's Report dated October 1 2001, McCreless made it clear that the separation process had been put on hold.  (Pl.'s Exh. P-248, p. 013239 (President's report indicating there is value in unseparated brucitic marble.))

Johnson stated that he objected to the formation of ACM-Texas, LLC in 2001 on several grounds, including the fact that the formation of the entity allowed McCreless to raise more money while maintaining absolute majority control of ACM.  Nevertheless, ACM-Texas, LLC was formed over Johnson's objections.

Additionally, Johnson testified that his father filed a lawsuit against ACM and McCreless in Colorado.  Johnson was added to the lawsuit as a third party by McCreless.  Johnson admitted that he had bad feelings toward McCreless because Johnson believed McCreless took money

---

[4] Separation Technologies became part of Titan America in 2002, and is now known as Separation Technologies LLC, with its headquarters in Daleville, Virginia, and its Technical Center in Needham, Massachusetts.

from people on false pretenses.  Johnson contacted other investors and encouraged them to file complaints if they felt comfortable doing so and also contacted an SEC investigator.  He also represented to the Court that he understands that the SEC undertook an investigation of ACM, but subsequently deferred to an IRS investigation.  Johnson testified that he was aware of no charges filed against ACM.

As to the money Johnson loaned to McCreless, he testified that from September 1999 through September 2006, McCreless made interest payments on the note, but that the payments stopped after January 2007.  Johnson testified that he had no direct role in negotiating the 1999 Letter Agreement and only found out about TAA shortly before the ACM shareholders meeting in 2007.

Rick Reaves.  Reaves is McCreless' first cousin and was employed by ACM-Texas, LLC. He worked in sales and marketing in a territory covering the southern half of Texas and extending to Pensacola, Florida.  His work for ACM-Texas LLC involved finding places to sell ACM's product and finding new uses for the product.  Reaves effectively ceased to work for ACM-Texas, LLC in 2002, when McCreless ceased payment.  He did not formally resign, however, until May 2004.

In addition to working to find new uses and markets for brucitic marble, Reaves invested $100,000 of his own money and was a voting member of ACM-Texas, LLC at the time of trial. He testified that there had not been a meeting pertaining to the Texas entity since he had been associated with it.  According to Reaves' testimony, McCreless raised approximately $5,500,000 from selling units of the partnership to somewhere between 125 and 150 total shareholders/partners.

Reaves testified that as of the date of trial, there was a lawsuit pending in El Paso between Reaves and McCreless. Reaves testified that in the lawsuit McCreless contended that Reaves stole a trade secret, the use of brucitic marble powder as an insecticide, but he believes McCreless had dropped such a cause of action. Reaves stated that he filed a provisional patent for the use of brucitic marble powder as insecticide in 2004, before he had formally resigned from ACM-Texas, LLC. Reaves admits to have gained knowledge of this use of brucitic marble powder while working at ACM-Texas, LLC.

Manuel Baeza. Baeza testified that he is TAA's mining foreman at Marble Canyon and has been working for TAA since 1982. He worked in mining even before he began working for TAA. He stated that his MSHA qualifications include a certificate allowing him to mine underground, instructor certification, and certification of mine rescue team qualifications.

Baeza primarily testified as to what took place at Marble Canyon. He testified that ACM had between four and six people working at Marble Canyon at a time, and that he believed Abel Becerra, a former employee of TAA, worked as ACM's mining foreman.

One of the issues Baeza testified about was ACM taking rock from TAA's stockpiles at Marble Canyon. Baeza testified that ACM's mining crew took the rock that Baeza and his crew had mined and stacked. Baeza testified that he and his crew placed material they had milled in a specific location as part of his duties as foreman. He testified that he recorded when ACM's mining crew took TAA's materials and how much ACM's crew took, at the time the materials were taken. Based on his notes, he stated that the total tonnage of the material ACM took from TAA was 2,503 tons between November 17, 2003 and June 2007. (Pl.'s Exh. 195.) Baeza testified that he had personally seen ACM take material three times. In addition, he informed Becerra that ACM was taking TAA's materials. Baeza stated that he had not personally

witnessed ACM take TAA's materials more often because those incidents occurred when TAA's crew was not working. He testified that TAA's crew only worked four days per week and ACM had access to the mine and a key to the gate. He reported each incident to Joe Williams, Jr. According to his testimony, Baeza also reported several incidents to the local sheriff, who came to Marble Canyon three to five times, but never made any arrests.

Baeza testified that he could tell the rock had been taken because there were tracks on the ground indicating that TAA's materials had been dragged to ACM's plant and because TAA's milling produced a larger final material than did ACM's milling. According to Baeza, the size of the material indicated what material belonged to which mining operation.

Baeza additionally testified that Abel Becerra offered to pay Baeza under the table for TAA's rock. Baeza testified that he refused Becerra's offer, and told Joe Williams, Sr. about the incident by telephone. He did not, however, record the incident.

At trial, Baeza reviewed citations MSHA issued him in response to the allegation that the January 2008 blasting damaged TAA's building. (Pl.'s Exhs. 315-316.) According to his testimony, he received a citation because it was reported that he set off dynamite and damaged ACM's building. (Pl.'s Exh. 315.) He testified that following this citation, MSHA gave Baeza a continuation of the citation, based on additional information that Baeza had in fact warned ACM of the blasting. (Pl.'s Exh. 316.) While Baeza admits setting off dynamite on the day in question, he testified that ACM had ceiling holes on its plant prior to the blasting and that he does not know whether or not the fly rock caused any damage to ACM's building or equipment. Baeza testified that dropping dynamite into a drilled hole and then exploding the dynamite is the only way to mine, and that both TAA and ACM engage in dynamite blasting. Baeza testified that on the date of the incident at issue, he gave a customary warning to ACM.

Baeza also testified to the damage ACM caused to TAA's mine.  According to his testimony, Joe Williams had told Baeza to barricade the entrance to TAA's underground mine to prevent ACM from entering the mine.  Baeza thus placed a large truck in front of the mine so that it blocked the entrance.  Baeza testified that ACM's mining crew moved the truck and extracted materials from TAA's underground mine.  During this procedure, ACM damaged the mine by lowering the floor.  Baeza explained that lowering the floor in the mine created a safety hazard because the floor and ceiling in TAA's underground mine were separated by 45-50 feet.  Once the floor was lowered, TAA's machines could no longer reach the ceiling to scale off rocks that might fall and endanger the miners.

Baeza testified that several days after this incident, MSHA issued a closure order to both TAA and ACM.  Both parties were ordered to stop work at the underground mine in Marble Canyon.  (Pl.'s Exh. 317.)

Jacinta Claire Williams.  Ms. Jacinta Williams is the office manager at the Burnet Bilbrough Marble Division plant and she oversees bookkeeping at both of TAA's plants.  She has been a bookkeeper since 1975, before she married Joe Williams, Jr., and she has worked continuously in the family business since her marriage.  She testified as to her familiarity with invoices, invoicing, bills of lading, and shipping.

In order to determine how much material ACM mined at Marble Canyon, Ms. Williams explained that she compared ACM's bills of lading to its invoices in both total tonnage and total dollar amount.  (*See* Pl.'s Exh. 257 (ACM's Invoices); Pl.'s Exh. 262, 265, 268, 272, 274, 277, 281, 282, 284, 291, 293, 297 (ACM's Bills of Lading)).  Ms. Williams testified that ACM's invoices indicated that ACM shipped 17,843 tons between 2000 and 2008 and that ACM's bills of lading show that during that same time ACM shipped 26,245 tons.  This produces a

discrepancy of 8,411 tons. Ms. Williams also used the invoices from ACM and bills of lading to calculate a dollar discrepancy. ACM's invoices totaled $4,998,149, and using the same pricing projection from the invoices and taking into account what type of material was being shipped, Ms. Williams calculated that the bills of lading totaled $7,052,053.

Dr. Terrance Patrick McNulty. McNulty is a consulting metallurgical engineer. (T. McNulty Test. 6/30; Pl.'s References to Evidence Exh. 14, at 5.) He has a bachelor's degree in chemical engineering from Stanford University, a master's degree in metallurgical engineering from what used to be the Montana School of Mines, and a doctorate in extractive metallurgy from Colorado School of Mines. He has been working in metallurgical engineering since 1966. (Pl.'s References to Evidence Exh. 14, at 6.) He is a member of the American Institute of Mining Metallurgical and Petroleum Engineers. (Pl.'s References to Evidence Exh. 14, at 8.) He has published roughly 40 articles. (Pl.'s References to Evidence Exh. 14, at 9.) McNulty has run his own consulting company since 1989. (Pl.'s References to Evidence Exh. 14, at 12.) McNulty testified that he worked with Paul Chamberlin, Plaintiff's second expert, in the past and that he believed Chamberlin was reliable.

McNulty was initially contacted by TAA to answer two specific questions: (1) what is the industrial meaning of the word beneficiation and (2) what is the meaning of high purity as it is applied to magnesium hydroxide. (Pl.'s References to Evidence Exh. 14, at 13.) He explained that beneficiation is a process of physically separating grains to focus on the specific minerals the producer wants. (Pl.'s References to Evidence Exh. 14, at 14.) He also explained that high purity would mean a degree of concentration or purity above 90 percent magnesium hydroxide. Based on these facts and the information provided to him by Chamberlin, he concluded that there was no beneficiation occurring at Marble Canyon. He testified that he was unaware of any way

35

the beneficiation could be simply done with an air process. (Pl.'s References to Evidence Exh. 14, at 15.) Air classification only differentiates the particles based on size into different products.

McNulty never visited the ACM processing plant nor has he ever consulted or worked on the design of a brucitic marble processing plant. (Pl.'s References to Evidence Exh. 14, at 25.) He also made his opinion regarding the lack of beneficiation at Marble Canyon without having seen anything in writing from someone who has actually seen ACM's beneficiation process. (Pl.'s References to Evidence Exh., 14 at 27.) He testified that screening alone could serve a rudimentary separation function. (Pl.'s References to Evidence Exh. 14 at 28.)

Paul Chamberlin. Paul Chamberlin is a metallurgic engineer that consults in the minerals business. He has a Bachelor of Science degree in metallurgical engineering from Michigan Technological University and an MBA from Arizona State University. (P. Chamberlin Test. 6/30; Pl.'s References to Evidence Exh. 13 at 5.) He has worked in the industry since 1960 except for a brief time in the U.S. Army. (Pl's. References to Evidence Exh. 13 at 6.) For the last 20-25 years, he has run a company, Chamberlin and Associates, that does metallurgy consulting primarily in gold and copper. (Pl's. References to Evidence Exh. 13 at 17.) Chamberlin testified that after he was hired as an expert in this case, he visited the mine to answer two questions: (1) is beneficiation being used and (2) is a high purity product being produced. He visited the mine at the beginning of 2008. (Pl's. References to Evidence Exh. 13 at 19.)

He first testified that he believed beneficiation was not occurring at the ACM facility because the process being used did not improve the mineral product. (Pl's. References to Evidence Exh. 13 at 19-20.) He explained that beneficiating improves the product by removing

36

unwanted materials and concentrating the desired material.  This would result in magnesium hydroxide.  He testified that the equipment at the ACM facility was not even capable of beneficiating the product.  It only crushed and screened the rock and more is required to be considered beneficiation.  (Pl's. References to Evidence Exh. 13 at 20-21.)  He also explained that because a product is being removed there must be a waste by-product left over from the process.  Since there were no waste materials produced at Marble Canyon, he testified this meant there was no beneficiation.  (Pl's. References to Evidence Exh. 13 at 21.)

Chamberlin testified that he did not see any equipment normally used in separation at the ACM facility.  (Pl's. References to Evidence Exh. 13 at 28.)  He only saw equipment for grinding and screening the material.  He explained that beneficiating could not be done merely by screening.  (Pl's. References to Evidence Exh. 13 at 29.)  He also explained that in his opinion a high purity magnesium hydroxide product would exceed 90% purity, and might require purity as high as 95-96%.  (Pl's. References to Evidence Exh. 13 at 33.)

Chamberlin based his opinion of the ACM mill on three samples he took from the facility.  (Pl's. References to Evidence Exh. 13 at 35.)  While there was a difference in the purity of the material, he did not consider it an improvement.  (Pl's. References to Evidence Exh. 13 at 36.)  Chamberlin did not do any testing while there was active milling or processing going on at Marble Canyon.

Robert McCreless.  Robert McCreless is the principal of both ACM and ACM-Texas, the defendants and counter-plaintiffs to this lawsuit.

According to his testimony, McCreless' interest in Marble Canyon began in September 1986, when he drove his father and two other directors from Fort Worth, Texas to a board meeting in San Saba.  At trial, McCreless described the meeting as a four-hour education in

brucite.  McCreless' interests, according to his testimony, lie in the potential markets available to Marble Canyon because of the chemical makeup of brucitic marble.  After doing extensive research on brucite, and synthesizing that research in a two-page report, McCreless took Joe Williams, Sr. and his wife Louise to lunch to see whether he could pursue the chemical aspect of brucitic marble.

As stated above, the first agreements between TAA and McCreless' business entities were unsuccessful because the GLO determined the conveyance contemplated was invalid.  According to McCreless' testimony, the GLO said that an assignment of the leases had to be a complete assignment, and not a partial assignment.  According to his testimony, when McCreless entered into the Letter Agreement, he was expecting full assignment of the 175-acre mining lease TAA had with GLO.

Throughout this time, he continued to research potential uses of brucitic marble/markets to expand the business.  McCreless testified that he began looking at acid neutralization in wastewater treatment because he foresaw that the carpet industry would be using fewer mineral fillers as fire retardants, due to the Environmental Protection Agency's ("EPA") changing regulations.[5]  In late 1997 or early 1998, the Sanitation Districts of Los Angeles County told McCreless they were interested in a second source of magnesium product for their sewer system.  Believing he needed his own plant to contain profits and control costs, McCreless formed ACM in July, 1998, as an S-corporation in Colorado.

In 1998, McCreless flew to Texas and told David Williams that he believed he would be getting significant, long-term contracts in the wastewater industry.  David Williams responded

---

[5]McCreless explained in his testimony that when a carpet is newly installed, it releases volatile organic compounds ("VOCs"), which cause the familiar "new carpet smell." In the mid-1990's the EPA became concerned VOCs could make people working in office buildings with newly installed carpet sick, and that the VOCs might even have carcinogenic effects. In response to new regulations responding to this concern, formulas for carpet backing began to change to require less capability from mineral fillers, relying more heavily on chemical formulations to achieve what the mineral fillers achieved.

that TAA had never been interested in pursuing the wastewater industry. After discussing an arrangement between TAA and the newly-formed ACM, Williams invited McCreless to draft an agreement. After further negotiations between McCreless and TAA, David Williams prepared the final draft of what is referred to in this litigation as the Letter Agreement. (Def.'s Exh. 4.)

McCreless testified that because of the Letter Agreement, he spent millions of dollars in research and development finding high-paying applications of brucitic marble in various industries. In March 2001, McCreless formed AMC-Texas, LLC to raise capital to allow ACM to pursue further market research.

McCreless testified about the terms of the 1999 Letter Agreement, his understanding of them, and his compliance with the terms as he understood them. McCreless testified that ACM worked diligently within the time period specified by the Letter Agreement to gain as much information as to the feasibility of the proposed arrangement. As to intent to move forward with plant construction, McCreless testified that in October 1999, ACM tendered a $5,000 check to TAA to indicate that ACM intended to move forward. (Def.'s Exh. 5). TAA cashed the $5,000 check, but never delivered recordable leases to ACM. The only lease ACM has received is the ground lease, known in this litigation as the Mine Mill Site Lease.

As to the competition provision of the Letter Agreement, McCreless testified that the provision left ACM free to develop markets that TAA was not supplying at the time of the agreement. (Def.'s Exh. 4, para. 6.) McCreless testified that he developed markets in industries willing to pay 10-15 times the price TAA received in the aggregate market.

ACM's Marble Canyon mill was fully operational by March 2001, according to McCreless's testimony. While McCreless acknowledged that ACM demanded a payment of $200,000, McCreless testified that he would not pay that amount without receiving recordable

leases because McCreless felt he needed the recordable leases to secure mineral rights, to exclude competitors from buying brucitic marble at Marble Canyon, and to obtain financing.

McCreless testified that before the August 2003 email from Joe Williams, Sr. instructing ACM not to bring a drill to the Marble Canyon property, no one from TAA told McCreless to stop building the ACM facility at Marble Canyon. The record indicates, however, that McCreless was first told not to bring a drill onto the property on June 10, 2002 via fax from Joe Williams, Sr. (Def.'s Exh. 13(m).) McCreless testified that he responded to the email by saying that he believed he had the right to mine at Marble Canyon, and invited Joe Williams, Sr. to have David Williams send something regarding ACM's right to mine to TAA's corporate lawyer for him to look over and respond. The June 10, 2002 fax includes a statement from McCreless stating, "[u]nder the terms of the binding Letter of Agmt that you signed with ACM Corp, we certainly have the right to mine for our own supply. I suggest you check with David who is TAA's legal counsel. If he will write a letter stating why ACM cannot mine, then we will respond accordingly." In September 2003, ACM retained an attorney to send a demand letter to TAA. (Pl.'s Exh. 118.) In the letter, ACM demanded the recordable leases per the 1999 Letter Agreement, or it would have to file suit.

Much of McCreless's testimony was related to whether McCreless represented to ACM that he could separate brucitic marble from calcium carbonate and whether he had the capability to do so. McCreless testified that he understands "high purity" brucite, or magnesium hydroxide, to mean a substance that is low in "impurities," which he understands as silica, aluminum, iron, or any other impurity that is debilitating to certain market applications. McCreless admits that the expert testimony introduced at trial (that high purity brucitic marble would be something with more than 90% magnesium hydroxide), is at variance with his understanding of high purity

brucitic marble.  He notes, however, that the 1999 Letter Agreement does not denote a specific percentage and that the experts do not work with brucitic marble.  McCreless further admits that in the materials McCreless prepared, on RMC Minerals Letterhead, specified high purity as 90% or better for high purity magnesium oxide, and that his January 2000 letter to Joe Williams, Sr. shows a flow chart indicating production high purity magnesium hydroxide.  (Def.'s Exh. 11.) McCreless also admits that obtaining 90% magnesium hydroxide from the brucitic marble at Marble Canyon would require a separation process.

McCreless testified that he and Joe Williams, Sr. discussed the possibility of separating magnesium hydroxide out of the ore and they did some testing of the separation processes to determine if those processes would effectively separate magnesium hydroxide.  McCreless stated that he shared some information about the potential uses of brucite with the Williamses, but felt that he needed to be a little bit guarded, at least until there were further agreements that would lead to leases.  McCreless contends that the plant in Marble Canyon, built in 2000, is capable of doing air separation and separation by air screen units.  He admitted, however, that the best that can be done at Marble Canyon by ACM's plant is to beneficiate the marble to approximately 50%.  ACM did not sell this 50% magnesium hydroxide product to anyone, because the markets McCreless provided did not need it.

McCreless testified that in a laboratory setting, the brucitic marble from Marble Canyon has been beneficiated to contain a higher percentage of magnesium hydroxide.  A business entity in Needham, Massachusetts corresponded with McCreless about separation testing they were doing.  The type of separation process the company tried to employ was a proprietary electrostatic beneficiation process.  McCreless testified that the entity sent him correspondence indicating that the best separation, on a first pass through, raised the magnesium hydroxide

concentration from 32% to 48%, which the outfit in Massachusetts characterized as "not good enough."

Regarding the GLO royalties, McCreless testified that TAA represented to him that TAA paid GLO royalties at the rate of $0.67/ton. From 1999, McCreless testified that he sent ACM royalty checks based on 10% of the end selling price to TAA. According to McCreless' testimony, this amount was based on the spirit of the Letter Agreement. McCreless testified that the checks were delivered to David Williams' office at the San Saba courthouse. Before February 2003, McCreless received no communication from TAA indicating that it objected to the royalty checks. (Def.'s Exh. 20 (which shows last royalty payment check was cashed in November 2001)). ACM continued to send royalty checks to TAA after 2003, but TAA did not cash them. In 2006, according to his testimony, McCreless met with GLO agent Bill Farr, who set up a blanket authorization allowing ACM to pay GLO directly, bypassing TAA. McCreless submitted information regarding ACM's production and sales of material from Marble Canyon to the GLO, but is unsure if these numbers were used when Bill Farr calculated TAA's non-payment and underpayment of ACM production royalties.

McCreless also testified regarding the incidents that took place at Marble Canyon. First, he testified that in January 2008, TAA damaged ACM's Marble Canyon plant and one of ACM's drills. (Def.'s Exh. 23.) McCreless stated that ACM could not use the drill until the windshield was replaced at a cost of $1,500. ACM's crew did some informal patchwork on the roof of the plant. Additionally, McCreless testified that ACM did not misappropriate materials from TAA's stockpiles. He testified that there is no way to differentiate between ACM's and TAA's materials other than that the ACM mining crew knew the locations of its own stockpiles, and knew approximately how many tons of shock rock were produced by a particular shock.

McCreless admitted, however, that there is a possibility that through the years some of ACM's rock was stored close to or on top of some of TAA's older materials.

McCreless then testified regarding the events that led to ACM-Texas' bankruptcy. To begin, he testified that on January 26, 2006, the EPA issued ACM a stop order to stop its sale of pesticide product NIC 325. (Pl.'s Exh. 307.) On October 26, 2007, the EPA issued a second stop order that applied to two more of ACM's insecticide products. Both stop orders are still in effect.[6] (Pl.'s Exh. 308.)

McCreless testified that the immediate cause of ACM-Texas' filing for bankruptcy was a March 29, 2008 labor strike at the Cananea copper mine in Northern Mexico. According to McCreless' testimony, ACM-Texas had a contract with Grupo México, S.A.B. de C.V. to supply between 1,000 and 1,500 tons of material to its copper mine at Cananea. The March 2008 labor strike shut down mining operations altogether, causing ACM-Texas to lose revenue. McCreless also testified that ACM-Texas spent significant amounts of money in preparation for the Cananea contract.

During his testimony, McCreless also conjectured that he was unable to raise additional capital to avoid bankruptcy because Kit Bramblett, Rick Reaves, and Drake Johnson were contacting members of ACM and telling the members that ACM had no contractual rights in Marble Canyon and that McCreless had made and was making fraudulent misrepresentations.

---

[6]In his testimony, McCreless explained that these stop orders were issued because in order to market a pesticide in the United States, the pesticide product must be registered with the EPA or be allowed within the provisions of FIFRA § 25(b). Despite discussions and correspondence between ACM and the EPA, which indicated that ACM's pesticide products were exempt under § 25(b), Rick Reaves pointed out an ambiguity on the labeling of ACM's pesticide products which caused the EPA to issue the stop orders. These stop orders do not preclude ACM from registering the pesticide with the EPA, and then selling the product.

## V.

### CONCLUSIONS OF LAW

A.    Plaintiff's Causes Of Action.

      1.    Lack Of Contract/Breach Of Contract.

Plaintiff first argues that the April 2, 1999 Letter Agreement is unenforceable and, in the alternative, that ACM breached the Letter Agreement. The relevant terms of the Letter Agreement state:

> Upon such election [by ACM] and the contemporaneous payment to TAA of Five Thousand & no/100 Dollars ($5,000.00), TAA shall cause recordable leases of mineral and surface rights in the Subject Lands, appropriate to the project contemplated herein, to be delivered to ACM.

After ACM made the election, it began building a mill on the property it leased from TAA, and after several years of negotiation, no recordable leases of mineral and surface rights were ever provided.

There are two possible readings of the Letter Agreement that could make it a contract. The agreement could either be a contract with some terms still open to negotiation or an agreement to agree. Each interpretation requires that the contract contain all material elements and meet the requirements under the statute of frauds. Because the Letter Agreement under either reading meets neither of these two fundamental requirements, the Court finds that it is not an enforceable contact.

It is established law that a writing need not have all the stipulations between the parties to be considered a contract. *Osborn v. Moore*, 247 S.W.2d 498 (Tex. 1923). Rather, a contract need only have the essential elements. *Id.* A contract can also exist even though there are terms on which the parties have not agreed and which they expect further negotiation. *Scott v. Ingle Bros. Pacific Inc.,* 489 S.W.2d 554, 555 (Tex. 1972). Nevertheless, when an *essential* term is

left open for future negotiation, there is no binding contract. ***T.O. Stanley Boot Co., Inc. v. Bank of El Paso***, 847 S.W.2d 218, 221 (Tex. 1992). An agreement to make a future agreement is enforceable only if it contains all essential terms. ***Fort Worth Indep. Sch. Dist. v. City of Fort Worth***, 22 S.W.3d 831, 846 (Tex. 2000). Thus, to decide whether the agreement is enforceable, the Court must first determine what the material elements of the contract are, and then whether those elements are included in the Letter Agreement.

Contracts must be read separately to determine the necessary material terms. ***T.O. Stanley Boot Co., Inc. v. Bank of El Paso***, 847 S.W.2d 218, 221 (Tex. 1992) (citing ***Bridewell v. Pritchett***, 562 S.W.2d 956, 958 (Tex. Civ. App.–Fort Worth 1978)). Material terms "are those that the parties would reasonably regard as vitally important elements of their bargain." ***Potcinske v. McDonald Property Investments, Ltd.***, 245 S.W.3d 525, 531 (Tex. App.-Houston [1st Dist.] 2007) (citing ***Neeley v. Bankers Trust Co.***, 757 F.2d 621, 628 (5th Cir. 1985)). Additionally, a contract must define its essential terms with enough precision to enable the court to determine the obligations of the parties. ***Central Texas Micrographics v. Leal***, 908 S.W.2d 292, 296-297 (Tex. App.-San Antonio 1995) (citing ***Weitzman v. Steinberg***, 638 S.W.2d 171, 175 (Tex. App.-Dallas 1982)).

No Texas court has specifically identified what terms will be material for a hard mineral lease. Nevertheless, a comparison can be drawn to oil and gas leases as they are both subsurface rights leases and both must meet the requirements of the statutes of frauds. Regarding oil and gas leases, courts have required the extent and duration of the lease to be included in a contract. ***Fagg v. Texas Co.***, 57 S.W.2d 87, 89 (Tex. Com. App. 1933). Other essential elements include the "term of the lease, the drilling commencement date, time and amount of payments in lieu of drilling operations, and amounts to be paid for produced gas." ***Oakrock Exploration Co. v.***

45

*Killam*, 87 S.W.3d 685, 690-691 (Tex. App–San Antonio 2002) (citing *Cantrell v. Garrard*, 240 S.W. 533, 534 (Tex. Comm. App. 1922)). In *Oakrock Exploration*, letters were given that stated that a future lease would be granted to the mineral rights owners. *Oakrock Exploration Co*. 87 S.W.3d at 687. The letters were signed but no lease was agreed upon. *Id*. at 688. When another company leased the property, the original offerers sued for breach of contract and tortious interference. *Id*. at 688. The court found that since there was no definitive description of the lease, the original agreements were not enforceable contracts as a matter of law. *Id*. at 691.

If a contract contains all but one material term, a court may still enforce the contract. For example, when all but the price of a good is missing, the court can still presume that a meeting of the minds exists and that a reasonable price was intended. *Bendalin v. Delgado*, 406 S.W.2d 897, 900 (Tex 1966). The absence of only a durational term also does not necessarily mean that no contract exists. *Moore v. Dilworth*, 179 S.W.2d 940, 942 (Tex. 1944). A court can presume a reasonable time was intended. *Id.* If a contract does not specify its duration or time of performance, however, it is not enforceable. *Id.* The court in *Moore v. Dilworth* reasoned that without one of these necessary terms of the contract, it is impossible for a court to determine the other. *Id.*

Here, the Defendants allege that all the required material terms are included in the Letter Agreement. They contend the material terms required are: (1) the starting date for the lease, (2) the terms of the lease, (3) the property involved, (4) and the price/consideration to be paid. Following *Oakrock* and *Fagg* these would be material terms of the lease. The Letter Agreement, however, does not have specificity as to many of these terms. Although the price is adequately described as "10% of the gross revenues," the only starting date mentioned is that of the delivery

of the lease ("[u]pon such election and the contemporaneous payment . . . ."). The starting date term does not refer to the start of any lease rights of ACM or whether that would be the start of mining, the creation of the separation facility, or the beginning of separation. The only terms of the lease described in the Letter Agreement are what will be mined, and that a facility will be built. It does not include the duration of the lease. Following *Moore*, without the duration and the start date, the Letter Agreement is not an enforceable contract.

The property involved is also not fully described. It is unclear from the Letter Agreement whether the lease "appropriate to the project contemplated herein" includes all the lands listed in Exhibit "A" or merely some of it. The later negotiations indicate that little of the agreement regarding the "recordable leases" was set in stone. There was not yet a decision regarding what piece of land each party would receive. (*See* Def.'s Exh. 6C (February 17, 2001 email from David Williams to McCreless stating, "I need to know which part of the 40 acres you want . . . .")) David Williams testified that there was no indication as to what specific lands would be given. (D. Williams Test. 6/29.) There is also no testimony by the Defendant as to any agreement regarding what specific lands would be given. (*See* R. McCreless Test. 07/02.) Thus, the Letter Agreement is not an enforceable contract because it lacks several material terms.

Additionally, the Court cannot enforce the terms of the Letter Agreement because it fails to meet the statute of frauds. Mineral interests are treated as real property interests and are therefore subject to the rules relating to real property, including the statute of frauds. *See Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89, 134 (Tex.App.–El Paso 1997). Therefore, a lease of mineral rights for longer than one year must be in writing. Tex. Bus & Com. Code Ann § 26.01(b)(5). Thus, if the Letter Agreement here is a contract with a missing term, then it must meet the statute of frauds.

If the future agreement is covered by the statute of frauds, then the agreement to make a future agreement must also meet the statute of frauds. ***Hartford Fire Ins. Co. v. C. Springs, 300, Ltd.***, 287 S.W.3d 771, 778 (Tex. App–Houston [1st Dist.] 2009) (citing ***Baylor Univ. v. Sonnichsen***, 221 S.W.3d 632, 635 (Tex. 2007) (holding that the statute of frauds bars a breach of contract claim based on an oral agreement to enter a future employment contract that would need to meet the statute of frauds)). If the Letter of Agreement is an agreement to make a mineral rights lease, as the Defendants allege, then it must also meet the requirements of the statute of frauds. Thus, whether the Letter Agreement is an agreement to make a future agreement or an agreement to make a mineral rights lease, it must meet the statute of frauds.

Some courts have specifically held that a writing that contemplates a contract to be made in the future does not satisfy the statue of frauds. ***Id*** (citing ***Martco, Inc. v. Doran Chevrolet, Inc.,*** 632 S.W.2d 927, 928-29 (Tex.App.-Dallas 1982 no writ); ***Southmark Corp. v. Life Investors, Inc.,*** 851 F.2d 763, 767 (5th Cir. 1988); ***Document Imaging, Inc. v. IPRO, Inc.,*** 952 F.Supp. 462, 468 (S.D.Tex. 1996). Writings that contain futuristic language are insufficient to show that a contract is already in existence. ***Hartford Fire Ins. Co.***, S.W.3d at 778. The limitation on futuristic language was built out of a reading of the case law of other states and the comments to the statute of frauds. ***Martco***, 632 S.W.2d at 928-929. One such comment reads, "'all that is required is that the writing affords a basis for believing that the offered oral evidence rests on a real transaction.'" ***Id.*** at 929 (quoting Comment 1 to ***Tex. Bus & Com. Code Ann*** §2.201(a)). In ***Martco***, the court reasoned that a writing that only referred to an early bid and was not a confirmation of any existing contract was not evidence of any real transaction. ***Id.*** In ***Hartford***, the agreement was to first deliver an acceptable contract and then the other party would stand ready to act as a surety. ***Hartford Fire***, S.W.3d at 778-789. The court held that the

48

"futuristic language," was not indicative of a present intent to act as surety.  Similarly, the court in *Document Imaging* found no contract existed when a letter stated the parties would "agree to formalize" a relationship and that such language was insufficient to meet the statute of frauds. *Document Imaging, Inc.,* 952 F.Supp. at 468.  The case law is unclear on what element of the statute of frauds is missing when the contract contains futuristic language.  Nevertheless, as the Letter Agreement also refers to the formation of a future contract it would not meet the statute of frauds.

In addition, more is needed to meet the definiteness standards of the statute of frauds. Where parties contracted to "get together later and make a fair selection of acreage," the court found an unenforceable agreement to agree. *Stekoll Petroleium Co. v. Hamilton*, 255 S.W.2d 187, 192 (Tex. 1953).  In *Stekoll*, the original contract stated that there would be an equitable distribution of land in a checkerboard pattern on a 5000 acre plot of land. *Id.* at 191.  The court found that without a close enough pattern for the first block of land to use as the basis of the checkerboard, the contract fails as it does not specify the terms of the future contract to be made. *Id.* at 192.

Here, the Letter Agreement has even less description.  Although the agreement describes the maximum amount of land available for lease, it does not indicate what section or distribution of the lands will come in that future lease.  While it does say the leases will be "appropriate to the project contemplated herein," that statement gives the court little guidance.  The intent of the parties or extrinsic evidence will not be considered when resolving a matter of the statute of frauds. *Fears v. Texas Bank*, 247 S.W.3d 729, 736 (Tex.App.-Texarkana 2008).  The Letter Agreement only indicates the parties which with enter into surface and mineral leases appropriate to the mining of brucitic marble and the construction of a brucitic marble

49

separation/milling facility.  There is no indication in the contract as to how much land such a project would take.  Thus, as there is no other description in the Letter Agreement, it does not meet the statute of frauds and is unenforceable.

  2.  Common Law And Statutory Fraud.

  TAA raises both a common law fraud and a statutory fraud claim.  To prevail under a common law fraud claim TAA must show that (1) ACM made a material representation that was false; (2) ACM knew the representation was false or made it reckless as a positive assertion without any knowledge of its truth; (3) it intended to induce TAA to act upon the representation; and (4) TAA actually and justifiably relied upon the representation and thereby suffered injury. ***Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.***, 51 S.W.3d 573, 577 (Tex. 2001).  "A fact is material if it would likely affect the conduct of a reasonable person concerning the transaction." ***Coldwell Banker Whiteside Associates v. Ryan Equity Partners, Ltd.***, 181 S.W.3d 879, 888 (Tex. App.—Dallas, 2006) (citing ***Custom Leasing, Inc. v. Tex. Bank & Trust Co.***, 516 S.W.2d 138, 142 (Tex. 1974); ***Miller v. Kennedy & Minshew. P.C.***, 142 S.W.3d 325, 345 (Tex. App.—Fort Worth)).

  The statements made by McCreless that ACM would beneficiate the marble were false.  All the discussion leading up to the Letter Agreement was about a product with a purity of 90% or more.  Both experts testified that 90% purity was the industry standard.  Despite this fact, McCreless testified that his product was only 37-50% magnesium hydroxide.  His magnesium hydroxide did not meet the standards implied in the discussions leading up the Letter Agreement, therefore his statements were false.

  There is, however, no evidence that Robert McCreless knew the statement was false or that the statement was made recklessly without any knowledge of the truth at the time the parties entered into the Letter Agreement.  The only evidence given is that McCreless eventually started

focusing on selling the non separated brucite.  (Pl.'s Exh 248, p. 013239-40.)  There was also no evidence that the statement was given recklessly.  For a statement to be reckless it must be made by a person (1) without any knowledge of the truth; (2) who knows that he does not have sufficient information to support the statement; or (3) who realizes he does not know whether the statement is true.  *Johnson v. Higgins of Texas, Inc. v. Kenneco Energy*, 962 S.W.2d 507, 527 (Tex. 1998).  While dealing as W&M, McCreless enlisted a noted metallurgist to determine whether beneficiating was feasible.  (Pl.'s Exh. 194, p. TAA-13039.)  He also testified that ACM completed the feasibility study required under the Letter Agreement and spent millions of dollars in research and development of high purity products.  (R. McCreless Test. 7/1.)  The evidence indicates that based on his research, McCreless believed that the development of high purity products was feasible.

Nor was there any showing of intent.  The intent required to prove a fraud claim is the intent to deceive.  *See Cotton v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 702 (Tex. App.—Fort Worth 2006).  TAA must show that ACM intended not to complete the promise to beneficiate the marble at the time the promise was made.  *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).

Here, the evidence demonstrates that McCreless did not intend to deceive TAA, he merely changed his opinion on the economic feasibility of producing high purity magnesium hydroxide.  In the early discussions regarding beneficiation, McCreless pointed to the value of brucitic marble products with a purity of 90% Mg(OH) or better.  (Pl.'s Exh 11, p. 00113.)  McCreless sent TAA a memo describing HMR-93, a product used for acid neutralization in waste water, that was listed at a purity of 93% Mg(OH).  (Pl.'s Exh 10.)  David Williams testified he felt this implied the products ACM would make would be of a similar high purity.

(D. Williams Test. 6/29.)  This belief was correctly placed as of January 20, 2000; McCrelless

sent TAA a letter showing ACM's plant flowsheet and the output was a product MGH-93.  (Pl.'s

Exh 210, p. 04850-51.)  McCreless testified that MGH-93 was the HMR-93 product he earlier

proposed for acid neutralization. (R. McCreless Test. 7/2.)  This is, however, where the story

turns.  The ACM President's report reveals that McCreless abandoned the idea of producing high

purity Mg(OH) after determining that the unseparated product was just as good as the separated

product.  (Pl.'s Exh. 248, p. TAA 013239-40.)  This shows that McCreless intended to make the

separated product, but after the promise was made he realized that producing the unseparated

product was a better deal.  Therefore, McCreless' intent was to complete the promise to separate

the brucite when the promise was made in the April 2, 1999 letter.  He simply changed his mind

after he signed the Letter Agreement.  That he did not complete the promise is not, in and of

itself, proof of fraud.  *Spoljaric*, 708 S.W.2d  at 435.

Although, TAA may have actually and justifiably relied upon the representation, it cannot

prove fraud without proving ACM's fraudulent intent.  Thus, TAA cannot recover under its fraud

cause of action.

3.      Unjust Enrichment Money Had And Received.

Next, TAA argues that it should recover under the equitable doctrine of money had and

received, or unjust enrichment.[7]  To recover under unjust enrichment, TAA must show that ACM

"obtained a benefit from another by fraud, duress, or the taking of an undue advantage."

*Heldenfels Bros. Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 43 (Tex. 1992).  In other words,

[u]njust enrichment is enrichment that lacks an adequate legal basis: it results from a transfer that

---

[7] "Under Texas law, an action for money had and received is an equitable doctrine applied to prevent unjust
enrichment." *Doss v. Homecoming Financial Network, Inc*. 210 S.W.3d 706, 709, n. 4 (Tex.App. – Corpus Christi
2006, pet. denied) (holding that although money had and received and unjust enrichment were pled as separate
causes of action, they are really the same cause of action).

the law treats as ineffective to work a conclusive alteration in ownership rights." ***Restatement (Third) of Restitution and Unjust Enrichment*** § 1, cmt. b (Discussion Draft 2000).

The doctrine is based on the principle that someone that receives benefits which would be unjust for him to retain, ought to make restitution even though no contract exists. ***Mowbray v. Avery***, 76 S.W.3d 663, 679 (Tex. App.—Corpus Christi 2002, pet. denied). "A cause of action for unjust enrichment is not based on wrongdoing, but, instead, looks only to the justice of the case and inquires whether the defendant has received money or property which rightfully belongs to another." ***Everett v. TK-Taitio***, ***L.L.C.***, 178 S.W.3d 844, 859 (Tex. App.--Fort Worth 2005); *see also* ***Staats v. Miller***, 243 S.W.2d 686, 687 (Tex. 1951). Thus, the question the Court is asked to answer is "to which party does the money, in equity, justice, and law, belong." ***Bank of Saipan v. CNG Financial Corp.***, 380 F.3d 836, 840 (5th Cir. 2004, no pet.).

TAA argues that ACM was unjustly enriched by money received from the sale of materials it mined at Marble Canyon. The Court agrees. Although the parties initially agreed to allow ACM to mine while attempting to negotiate for mineral leases, ACM had no legal right to mine materials at Marble Canyon following the June 11, 2002 fax in which Joe Williams, Sr. told McCreless not to bring a drill onto the property. (Pl.'s Exh. 210, TAA 08256.) The materials ACM mined and sold after June 11, 2002 were therefore taken without an adequate legal basis. In other words, ACM was not legally authorized to mine materials from Marble Canyon and possessed no ownership rights in the materials it mined from Marble Canyon.[8] Any money ACM received from selling the materials it unlawfully mined was unjust enrichment, and should be awarded to TAA, who possessed ownership rights in those materials.

---

[8] The only valid and enforceable contract that exists between TAA and ACM-Texas is the Mine Mill Site Lease, which does not explicitly grant ACM-Texas mineral rights. ACM-Texas does not argue that the Mine Mill Site Lease grants mineral rights. Moreover, it is unlikely that the $600 per year lease that ACM-Texas was to pay under the Mine Mill Site Lease could be construed as adequate consideration for a mineral leasehold at Marble Canyon. (*See* Pl.'s Exh. 102).

The Court considers the GLO records the most reliable evidence of ACM's enrichment. According to these records, ACM-Texas was paid $7,125,073.08 in exchange for 12,858.24 tons of minerals mined at Marble Canyon from July 2002 to December 2007. (Pl.'s Exh. 193, TAA 12314-16.) Although TAA also seeks restitution for money received by ACM for materials sold before June 16, 2002, it is estopped from doing so because the evidence and testimony indicate that until that date, TAA allowed ACM to mine on the property while the parties attempted to negotiate an agreement.

Thus, TAA may recover the enrichment derived by ACM from the mining and sale of materials from Marble Canyon, which the Court finds to be $7,125,073.08. Costs of labor and equipment incurred by ACM would be subtracted from this amount had the Court found evidence of these costs in the record, but it did not.

4.    Accounting And Damages.

An action for accounting may be either a suit in equity or a particular remedy sought in conjunction with another cause of action. *Michael v. Dyke,* 41 S.W.3d 746, 754 (Tex. App.—Corpus Christi 2001). A claim for accounting can be found in equity, under a contractual arrangement, or a fiduciary relationship. *T.F.W. Mgmt., Inc. v. Westwood Shores Property Owners Ass'n*, 79 S.W.3d 712, 717 (Tex. App.—Houston [14th Dist] 2002). Although there is a contract between TAA and ACM in this case, the Mine Mill Site Lease, the accounting claim is based on royalties contemplated by the 1999 Letter Agreement. In order to receive an accounting, there must be a specific term in the contract that requires an accounting, not just a contractual relationship. *Id.* at 718-19. The Court has already found that the Letter Agreement is not an enforceable contract. The Lease does not contain any terms that require an accounting. Thus, there is no contractual right to an accounting and TAA must meet the requirements either because of a fiduciary relationship or because of equity.

In this case, no fiduciary relationship was pled or proved. The Court, therefore, finds that none exists for the purpose of an accounting.

An accounting is proper under equity if the facts presented are so complex that adequate relief is not available at law. *Id.* (citing *Hutchings v. Chevron U.S.A.*, 862 S.W.2d 752, 762 (Tex. App.—El Paso 1993). When the use of regular discovery allows for adequate relief, an accounting is not required. *T.F.W. Mgmt., Inc.*, 79 S.W.3d at 717-18. TAA did not establish why proper discovery methods are inadequate to determine the amount of marble mined. *See Hutchings,* 862 S.W.2d at 762. In fact, ACM gave information on how much it mined to the GLO and that information has been given to TAA. (Pl.'s Exh 193, TAA 11468-73.) Thus, as TAA gave no reason why normal discovery methods were inadequate, the Court does not grant TAA an accounting.

5.  <u>Conversion</u>.

To prove conversion TAA must show (1) TAA had legal possession of, or was entitled to, possession of the property; (2) ACM assumed and exercised dominion and control over the property in an unlawful and unauthorized manner to the exclusion of, and inconsistent with, TAA's rights; and (3) ACM refused TAA's demand for return of the property. *Texas Dept. of Transp. v. Crockett*, 257 S.W.3d 412, 416 (Tex. App.—Corpus Christi 2008). Demand and refusal is not necessary when the possessor's acts manifest a clear repudiation of the plaintiff's rights. *Cass v. Stephens*, 156 S.W.3d 38, 61 (Tex. App.—El Paso 2004).

TAA had possession of the marble. Testimony was given that when TAA milled its material it placed the rock in a specific site in the mine. (M. Baeza Test. 7/1.) The evidence also suggests that ACM assumed control over the property inconsistent with TAA's rights. Specifically, Manuel Baeza testified that he saw ACM take marble from TAA's pile. Based on his field notes, Baeza testified ACM took in a total of 2503 tons between Nov. 17, 2003 and June

2007.  No testimony was given by the Defendant to rebut the actual taking of the rock.  In fact, McCreless acknowledged that ACM probably took some of TAA's material.  (R. McCreless Test. 7/2.)  Taking the material is a clear repudiation of TAA's rights in ownership so no demand is required.  Thus, the Court finds that ACM converted some of TAA's property, but the evidence does not demonstrate how much of the material was taken.  In terms of damages for the conversion, TAA asks for recovery in the amount for which the Defendant sold its material.  The Court has already awarded TAA with the total amount of its material sold by ACM.  Any damages the Plaintiff suffered due to the conversion will be reflected in the total unjust enrichment award because the material converted by ACM was sold and reported to the GLO.

Plaintiff also alleges the conversion was done with malice and that TAA should be awarded exemplary damages.  Malice may be implied if the defendant knew or should have known that he had no legal right to the property.  ***Kinder Morgan N. Tex. Pipeline, L.P. v. Justiss***, 202 S.W.3d 427, 447-48 (Tex. App.—Texarkana 2006).  The only evidence given that ACM knew it did not own the marble was Mr. Baeza's testimony that he told the ACM foreman that the rock was being taken.  (M. Baeza Test. 7/1.)  McCreless testified that both TAA and ACM maintained stockpiles of shot rock in the mine and that it is impossible to identify who owned the specific rock, as all the shot rock looked the same.  (R. McCreless Test. 7/2.)  The Court finds McCreless' testimony believable and that TAA did not meet its evidentiary burden in showing malice.  Therefore, the Court finds that TAA is not entitled to exemplary damages.

6.    Trespass.

To prevail under a trespass claim, TAA must show that "(1) it owns or has a lawful right to possess real property; (2) the defendant physically, intentionally, and voluntarily entered the land; and (3) the defendant's trespass caused damage." ***Stukes v. Bachmeyer***, 249 S.W.3d 461, 465 (Tex. App.—Eastland 2007).  Apparent consent to enter or authorized use is a defense to

trespass.  *Id.* at 465 n.1 (citing *Stone Res., Inc. v. Barnett,* 661 S.W.2d 148, 151 (Tex. App.—Houston [1st Dist.] 1983); *Ward v. Northeast Tex. Farmers Co-op Elevator,* 909 S.W.2d 143, 150 (Tex. App.—Texarakana 1995).  Consent, however, must be affirmatively pled.  *Stukes*, 249 S.W.3d at 465 FN1 (citing *Ward*, 909 S.W.2d at 150).

Here, the evidence demonstrates that TAA has the lawful right to posses the property in question either in fee or because the GLO leased TAA its mineral rights.  It is undisputed that ACM entered the land.  To recover for trespass, the plaintiff need only show that the defendant entered the plaintiff's property; intent to trespass is not required.  *Trinity Universal Ins. Co. v. Cowan,* 945 S.W.2d 819, 827 (Tex. 1997); *Texas Woman's University v. Methodist Hosp.*, 221 S.W.3d 267, 286 (Tex. App.—Houston [1st Dist.] 2006).  Whether or not ACM intended to violate TAA's property right is of no significance; it is the act of entering the property not the specific injury that must be intentional.  *Trinity Universal Ins. Co,* 945 S.W.2d at 827.

In this case, however, the damages caused by the trespass are not clear.  TAA only alleges that Defendants should be liable for "all the damages alleged above," but gives no indication as to what damages were distinctly caused by the trespass.  The Court will not infer damages beyond the taking of TAA's minerals.  This amount is subsumed in the unjust enrichment claim as that amount reflects all material sold by ACM.

7.  Tortious Interference.

The elements of tortious interference with an existing contract are: "(1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).  Intent requires either actual knowledge of the contract or at least knowledge of the circumstances such

that a reasonable man would believe a contract existed.  ***Amendariz v. Mora***, 553 S.W.2d 400, 406 (Tex. App.—El Paso 1977).

There was an existing contract between the GLO and TAA.  There was, however, no evidence of intent to cause a breach of the contract.  *See **John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.***, 17 S.W.3d 721, 730-31 (Tex. App.—Austin 2000).  TAA needed to show that ACM desired to cause a breach or that it believed a breach was substantially certain to result from its actions.  ***Fluor Enterprises, Inc. v. Conex Intern. Corp.***, 273 S.W.3d 426, 443 (Tex. App.—Beaumont, 2008).  There is no evidence to show ACM desired a breach.  In fact, there is evidence that ACM was trying to pay the GLO royalties.  Specifically, ACM sent TAA checks to cover the GLO royalties on their mines.  (R. McCreless 7/2; Def. Exh. 18, 20.)  TAA cashed the first six royalty payments, but then stopped.  (Def. Exh. 20.)  The evidence demonstrates that ACM contacted the GLO to ensure that the royalties were paid, not because it wanted to cause TAA to breach its contract with the GLO.  (Pl.'s Exh. 193, TAA-11468.)  The court would be hard pressed to find that ACM was trying to create a breach by paying TAA the royalties ACM thought were due under the Letter Agreement.  As there was no showing of intent to cause a breach in the contract between TAA and the GLO, the Court finds that TAA cannot recover under its tortious interference claim.

8.    Negligence.

TAA argues that ACM negligently, grossly negligently, maliciously, and with intent to harm, caused the MSHA to close the underground mine to TAA.  To establish negligence TAA must show ACM had a duty, there was a breach of that duty, and show damages proximately caused by the breach.  ***Kroger Co. v. Elwood***, 197 S.W.3d 793, 794 (Tex. 2006).  Whether a duty exists is a question of law.  ***Id.***

To show proximate cause, TAA must prove both that ACM-Texas's conduct was the cause in fact of MSHA's closure of the underground mine, and the foreseeability of the resulting harm to TAA. *W. Investments, Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). "These elements cannot be established by mere conjecture, guess, or speculation." *Doe v. Boys Club of Greater Dallas, Inc.*¸ 907 S.W.2d. 472, 477. ACM's conduct is a cause in fact of MSHA's closure order if TAA demonstrates that but for ACM's conduct, MSHA would not have issued TAA the Mine Closure Order. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003).

The negligent conduct TAA argues caused MSHA to close the underground mine occurred in July 2007. The evidence and testimony have persuaded the Court that on that date, ACM- employees entered TAA's underground mine, to which ACM had no legal access, harmed TAA's truck in the process of entering the mine, and damaged the floor of the mine by drilling and blasting once they had entered.

TAA cannot prevail on its negligence action, however, because it failed to prove that the conduct described above was the cause in fact of the Mine Closure Order. On July 31, 2007, MSHA issued a Mine Closure Order to both TAA and ACM that prohibited both parties from entering or working in the underground mine at Marble Canyon. (Pl.'s Exh. 317, TAA 11820-21.) The Mine Closure Order cited the "civil dispute taking place at this mining operation [and the] disagreement [between the mine operators] regarding their individual rights to mine at this property" as the reason MSHA decided to close the mine to both TAA and ACM to prevent employee injury. Although Joe Williams, Jr. speculated that the ACM blasting was the actual impetus of the Mine Closure Order, the evidence in front of the Court contains no representations by MSHA that suggest a reason for the closure of the mines, other than the ongoing civil litigation between TAA and ACM.

Because TAA fails to show ACM's conduct was the proximate cause of MSHA's issuing the Mine Closure Order, the Court need not reach the issue of whether ACM-Texas had a duty, and if there was a duty, whether ACM breached that duty. TAA's action for negligence is denied.

B.    Defendants' Counterclaims Related to Letter Agreement And Mine Mill Site Lease
      Breach Of Letter Agreement.

In its opinion on Plaintiff's Motion for Summary Judgment, the Court previously held that ACM's breach of Letter Agreement is barred by statute of limitations.

1.    Breach Of Mine Mill Site Lease.

A breach of contract claim requires the existence of a valid contract, performance or tendered performance by the plaintiff, breach of the contract by the defendant and damages sustained as a result of the breach. ***Winchek v. American Exp. Travel Related Services Co., Inc.***, 232 S.W.3d 197, 202 (Tex. App—Houston [1st Dist.] 2007) (citing ***Prime Products, Inc. v. S.S.I. Plastics, Inc.***, 97 S.W.3d 631, 636 (Tex.App—Houston [1st Dist.] 2002).

ACM contends that TAA breached the Lease by prohibiting ACM from accessing and using the property that was leased to them. The Lease gave ACM the right to establish a processing mill on the west half of the 40 acre tract of land that TAA owned in fee simple. (Def. Exh. 10.) The Lease, however, did not give ACM a right to mine. The only evidence presented as to any limitation of ACM's use of the leased property were the injunctions and temporary restraining orders entered by various courts that ordered TAA not to limit ACM's right to use the property. (Def. Exh. 24; Def. Exh. 25; Def. Exh. 27.) These orders, however, come with no evidence about whether TAA, in fact, prevented ACM from entering the property. There is mention of an evidentiary hearing in the August 6, 2007 order granting ACM temporary injunctive relief, but none of the evidence from that hearing was presented to this court. (Def.

Exh. 27.) It appears that a hearing for a permanent injunction never took place. Further, on March 29, 2009, the County Court of Culberson, Texas entered a Judgment that found ACM guilty of forcible detainer and awarded possession of the leased premises to TAA. (Def. Exh. 28). At trial, ACM gave no testimony as to anything TAA did to breach the Lease. Thus, the Court finds there was no evidence of a breach of the Mill Mine Site Lease.

      2.      <u>Tortious Interference With Defendant's Property Rights</u>.

Tortious interference with property rights is essentially a claim for intentional invasion of or interference with property rights. ***Surprise v. Dekock***, 84 S.W.3d 378, 382 (Tex. App.—Corpus Christi, 2002). ACM must show that TAA intentionally interfered with ACM's property rights under the Mill Mine Site Lease. ***Marrs and Smith Partnership v. D.K. Boyd Oil and Gas Co., Inc.***, 223 S.W.3d 1, 21 (Tex. App—El Paso 2005).

Just like the breach of the Mine Mill Site Lease claim, the only evidence presented by ACM was the previous restraining orders and injunctions. There was no testimony regarding anything TAA did to prevent ACM's use of the leased property. ACM simply provided the Court with the previous restraining orders and injunction entered by other courts. These orders do not provide any details about TAA's actions and do not demonstrate that TAA interfered with ACM's property rights. Thus, the Court finds that ACM failed to show that TAA interfered with ACM's property rights.

      3.      <u>Wrongful Eviction From Leased Premises</u>.

To prove wrongful eviction ACM must show (1) the existence of an unexpired lease; (2) occupancy of the property in question; (3) eviction or dispossession by the landlord; and (4) damages attributable to the eviction. ***McKenzie v. Carte***, 385 S.W.2d 520, 528 (Tex. Civ. App.—Corpus Christi 1964) (citing ***Reavis v. Taylor***, 162 S.W.2d 1030 (Tex. Civ. App.—Eastland 1942).

It is undisputed that the Mine Mill Site Lease was a valid lease. It is also undisputed that ACM occupied the property. There was, however, no evidence of eviction. An eviction requires the tenant to be "permanently deprived of the premises." *Martinez v. Bell*, 721 S.W.2d 580, 581 (Tex. App.—Corpus Christi 1986). ACM argued that the temporary injunction against TAA and TAA's later forcible detainer action are evidence of eviction. (Pl.'s Exh. 322.) There is, however, no evidence that ACM left the property or was permanently deprived of access. As there was no eviction, there can also be no damages attributable to the eviction.

Constructive eviction requires a showing of (1) TAA's intent that ACM should no longer enjoy the premises; (2) a material act by TAA that substantially interferes with ACM's use and enjoyment of the property; (3) an act that permanently deprives ACM of the use and enjoyment of the property; and (4) abandonment of the property by ACM within a reasonable time of the act. *Lazell v. Stone,* 123 S.W.3d 6, 11-12 (Tex.App—Houston [1st Dist.] 2003) (citing *Holmes v. P.K. Tubing, Inc.*, 856 S.W.2d 530, 539 (Tex. App.—Houston [1st Dist.] 1993); *Columbia/HCA of Houston, Inc. v. Tea Cake French Bakery and Tea Room*, 8 S.W.3d 18, 22 (Tex. App—Houston [14th Dist.] 1999)). The landlord's intent may be inferred from surrounding circumstances. *Lazell*, 123 S.W.3d 6, at 12 (citing *Holmes,* 856 S.W.2d at 539; *Columbia/HCA*, 8 S.W.3d at 22). A constructive eviction claim relieves ACM of the obligation to pay any remaining rent under the lease and entitles ACM to recover any loss which is a foreseeable consequence of the eviction. *Lazell*, 123 S.W.3d 6 at 12 (citing *Charalambous v. Jean Lafitte Corp.*, 652 S.W.2d 521, 526 (Tex. App.—El Paso, 1983).

The wrongful detainer claim is evidence of TAA's intent to remove ACM from the premises. Like the wrongful eviction claim, however, there is no evidence of a material act on the part of TAA that permanently deprived ACM of the use of the property. There is also no

evidence that ACM ever left the premises. Therefore, the Court finds there was no constructive eviction.

4. <u>Fraudulent Misrepresentation And Inducement</u>.

A fraudulent inducement claim is essentially a special type of fraud claim. *See **In re First Merit Bank, N.A.,*** 52 S.W.3d 749, 758 (Tex. 2001) (listing the elements which are identical to a normal fraud claim). To prove its claim ACM must show (1) TAA made a material representation that was false; (2) TAA knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) TAA intended to induce ACM to act upon the representation; and (4) ACM actually and justifiably relied upon the representation and thereby suffered injury. ***Ernst & Young,*** 51 S.W.3d at 577. The distinction is that a fraudulent inducement claim requires the existence of a contract. ***Haase v. Glazner***, 62 S.W.3d 795, 798 (Tex. 2001). Without a binding agreement there is no detrimental reliance and therefore no fraudulent inducement claim. ***Id.***

ACM contends that misrepresentations were made regarding the ability of TAA to enter into the leases considered under the Letter Agreement. ACM claims this induced them to enter into the Letter Agreement. Because the Letter Agreement is not a binding contract, ACM has failed to show detrimental reliance and fraudulent inducement. Thus, the Court finds that ACM cannot recover on its fraudulent inducement claim.

5. <u>Fraud By Nondisclosure</u>.

Fraud by nondisclosure is another subcategory of fraud. ***Schlumberger Tech. Corp. v. Swanson***, 959 S.W.2d 171, 181 (Tex. 1997). The misrepresentation arises from a nondisclosure that is as misleading as a positive misrepresentation of facts. ***Id***. When there is a duty to speak, silence can be just as misleading as a misrepresentation. ***Id***. In other words, "silence may be equivalent to a false representation only when the particular circumstances impose a duty on the

party to speak and he deliberately remains silent." *Bradford v. Vento*, 48 S.W.3d. 749, 755 (Tex. 2001) (citing *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex. 1995)). Whether such a duty to speak exists is a question of law. *Bradford*, 48 S.W.3d. at 755. A duty to speak may exist in an arm's-length transaction when a party makes a partial disclosure that, although true, conveys a false impression. *Id.* A duty of disclosure arises if there is a confidential or fiduciary relationship. *Insurance Co. of North America v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). Confidential relationships arise when the parties have dealt with each other for so long that one party can believe its interests are being taken care of by the other party. *Id.* In this case, there is no evidence of a confidential or fiduciary relationship.

ACM claims TAA failed to disclose its inability to furnish the leases required by the Letter Agreement. ACM alleges the duty to disclose arises from its inability to find out this information. A duty to disclose can arise when one party knows a material fact and is aware that the other party does not have equal opportunity to discover the truth. *Miller v. Kennedy & Minshew Professional Corp.*, 142 S.W.3d 325, 345 (Tex. App.—Fort Worth 2003).

In this case, however, there is no evidence that TAA was aware that ACM did not have equal opportunity to discover information regarding TAA's inability to provide the leases. TAA pointed out to McCreless as early as January 5, 2000, that the GLO disallowed partial assignments. (Def. Exh. 6(d)). When McCreless signed the Letter Agreement he knew, or should have known, about TAA's inability to grant a partial assignment to ACM because W&M's prior attempt to obtain mineral leases from TAA had failed because of the GLO's restriction. (Pl.'s Exh. 18.) McCreless testified that when the parties negotiated the Letter Agreement, he believed that ACM was negotiating for a full assignment of TAA's mineral rights. There is no evidence, however, that TAA knew that McCreless wanted a full assignment

of the mineral rights and remained silent about its inability or unwillingness to grant the full assignment.

Because fraud by nondisclosure is a breed of fraud, ACM must also show TAA intended to deceive ACM and that ACM justifiably relied upon that representation and suffered injury. *See Cotton*, 187 S.W.3d at 702. Evidence of things that occurred after the fact can be used to infer intent. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).

There was no evidence that TAA intended to defraud ACM. The long ongoing negotiation is evidence of intent to work the problem out rather than an intent to deceive. There is also no evidence that ACM's reliance on the Letter Agreement was justified. First, the Court has already found that the Letter Agreement is unenforceable. Second, ACM built the facility without the recordable leases even though the parties were in disagreement about how to convey the mining rights. Because there is no evidence of intent this court finds there was no fraudulent nondisclosure.

ACM also alleges that TAA failed to disclose its intent not to provide the mining leases. This is a distinct failure to disclose, but a similar analysis applies. Assuming that TAA had the intent to lure ACM into the Letter Agreement and Mine Mill Site Lease and then not provide mining rights, it would indeed be a material fact that ACM would likely not have been able to determine. There is, however, no evidence of the intent not to provide mining rights. The ongoing negotiations again show that TAA tried to provide the proper conveyances. That the parties negotiated and simply could not reach common terms is not evidence of intent to not deliver the mineral rights. Ultimately, the evidence demonstrates that the parties attempted to negotiate toward a mutually beneficial business arrangement and the negotiations failed.

Because there was no evidence of intent to not deliver the leases, the Court finds that there was no material fact that TAA failed to disclose.

      6.    <u>Detrimental Reliance/Promissory Estoppel</u>.

To recover under a claim of promissory estoppel ACM must show "(1) a promise; (2) foreseeability of reliance thereon by the promisor; and (3) substantial reliance by the promisee to his detriment." ***English v. Fisher***, 660 S.W.2d 521, 524 (Tex. 1983). Promissory estoppel is usually a defensive theory, but it can be used as a cause of action if the promisee "acted in his detriment in reasonable reliance on an otherwise unenforceable promise." ***MCN Energy Enter., Inc. v. Omagro de Colombia, L.D.C.***, 98 S.W.3d 766, 774 (Tex. App-Fort Worth 2003) (citing ***Wheeler v. White***, 398 S.W.2d 93, 97 (Tex. 1965)). Promissory estoppel does not create a contractual relationship where none existed and cannot be used as a counter-defense to the statute of frauds. ***Frost Crushed Stone Co., Inc. v. Odell Geer Const. Co., Inc.***, 110 S.W.3d 41, 46-47 (Tex. App.—Waco 2002, no pet.). The doctrine only "prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them." ***Wheeler***, 398 S.W.2d at 96. Thus, "damages recoverable in a case of promissory estoppels are not the profits that the promise expected, but only the amount necessary to restore him to the position in which he would have been had he not relied on the promise." ***Id.*** at 47. Whether promissory estoppel is an appropriate remedy is a question of fact. ***Sonnichesen v. Baylor Univ.***, 47 S.W.2d 122, 124-27 (Tex. App. – Waco 2001, no pet.).

ACM identifies the April 1999 Letter Agreement and TAA's behavior in compliance with the Letter Agreement as the promise upon which it detrimentally relied. According to ACM's pleadings, ACM detrimentally relied in the following four ways: (1) ACM expended $1.2 million constructing a mill at Marble Canyon; (2) ACM employed personnel to work at Marble Canyon; (3) ACM entered into contracts to sell brucitic marble only available at Marble

Canyon; (4) ACM expended resources to raise capital funds and create and sustain business relationships.

Although the Court has determined that the Letter Agreement was not a valid contract, it may still be considered a promise that is the basis of a promissory estoppel claim. Other courts have found promissory estoppels present where a contract was found invalid for indefiniteness or uncertainty. *Wheeler*, 398 S.W.2d at 95-96. The doctrine of promissory estoppels dictates that a party is compensated for harm suffered as justice requires. *See* Restatement (Second) of Contracts § 90(1); Restatement (Second) of Contracts § 90, cmt. a.

Here, the Letter Agreement combined with TAA's subsequent behavior consisting of continued negotiations toward a mineral rights agreement and allowing ACM-Texas to mine and build at Marble Canyon without disturbance or protest, indicate a promise that TAA and ACM-Texas would enter into a long-term contractual relationship, in which ACM would be allowed to mine and mill at Marble Canyon, and sell the materials it mined and milled in specified markets that do not compete with TAA. At trial, David Williams acknowledged that the relationship between TAA and ACM began amicably and the parties mined jointly by agreement for several years. The evidence suggests that it was not until it became clear to TAA that ACM would not beneficiate that the relationship began to sour and it was not until the fax instructing ACM not to bring a drill to Marble Canyon in June 2002 that ACM had notice that TAA did not intend to continue the business relationship. The issue the Court must now decide is whether it was foreseeable and reasonable that ACM would rely on the promise and whether ACM, in fact, relied on the promise to its detriment.

Under the Letter Agreement, ACM was to wait until it received the recordable leases of mineral and surface rights before it began construction of the mill; therefore, the Court finds that

it was unreasonable for ACM to rely on the Letter Agreement when it began constructing the mill without first obtaining the mineral rights. Nevertheless, ACM gave TAA notice of its intent to build the mill, TAA leased the mill-site to ACM, and TAA had actual knowledge of the construction of the mill. Its mine foreman was there four days a week while the mill was being built and an August 2000 letter informed TAA that ACM was building a mill at Marble Canyon. (Pl.'s Exh. 74.) There is no evidence that TAA attempted to delay or stop the construction, or to inform ACM that there was no valid agreement between the parties before the mill was completed in early 2001. It is TAA's actions in conformity with the promise that make ACM's reliance on the promise reasonable. The fact that ACM built the mill and spent years mining minerals to which it had no legal right, establishes that ACM relied on TAA's promise to grant it mineral rights to its detriment. Thus, the Court finds that ACM's promissory estoppel claim should be granted.

In its pleadings, ACM asserts that it expended $1.2 million constructing the mill. In a letter to TAA dated August 16, 2000, however, McCreless valued the structure at $75,000. (Pl.'s Exh. 74.) There is no evidence other than the assertion in ACM's pleadings and McCreless' testimony to suggest to the Court that ACM spent $1.2 million on the structure. The Court, therefore, finds that $75,000 in damages will compensate ACM's expenditures on the construction of the mill at Marble Canyon, because the Court finds the letter to TAA dated from the time the mill was constructed to be a more accurate representation of the cost of building the mill.

ACM cannot recover under its other claims of detrimental reliance. While ACM may have relied on TAA's promise to hire personnel to work at Marble Canyon, the Court is allowing ACM to maintain its profits for the period of time in which TAA allowed ACM to mine at

Marble Canyon. Therefore, ACM's employment of personnel until June 2002 was not detrimental. After the June 2002 fax instructing ACM not to drill at Marble Canyon, ACM's employment of personnel was unjustified. The damages ACM seeks for entering into contracts and expending resources in raising capital and developing relationships fail for the same reasons. Furthermore, the Court has no evidence of the personnel costs or the costs associated in raising capital and developing relationships. Thus, the Court finds that ACM should only recover $75,000 from TAA as reliance damages under the doctrine of promissory estoppel.

C.      Defendant's Counterclaims Related To The Actions Of Andrew Speyrer.

A number of ACM's counterclaims against TAA arise from the actions of Andrew Speyrer ("Speyrer"), a onetime business associate of ACM. On June 4, 2006, Speyrer broke into ACM's packhouse office, pilfered various documents, and attempted to set fire to the office. (*See* R. McCreless Test. 7/2; D. Williams Test. 6/30; J. Williams Test. 6/30).

ACM asks the Court to find TAA civilly liable for Speyrer's actions, and to award ACM whatever damages or equitable remedies the Court finds appropriate.

In its Answer, ACM brings counter-claims against TAA for trespass, alleging that "[a]s TAA's agent, Speyrer intentionally and voluntarily broke into and entered the property causing extensive damage to the property," as well as "Misappropriation of Business Information," and "Theft." While the controversy was in state court, TAA submitted a motion for summary judgment arguing that ACM had not met its burden in claiming civil conspiracy. ACM then responded to the motion, listing the relevant evidence supporting its claims of civil conspiracy against TAA arising out of Speyrer's conduct, and arguing that circumstantial evidence can be sufficient to establish the requisite intent and meeting of the minds.

AMC argues that "the Court is faced with an onslaught of circumstantial evidence *strongly* implicating TAA, through its officers and agents," including phone calls between Speyrer and Joe Williams, and communication between TAA's counsel and Speyrer, including documents produced by Speyrer to TAA.   Indeed, the evidence indicates that Speyrer and Samuel McDaniel ("McDaniel"), TAA's counsel, communicated often regarding Speyrer's interactions and business negotiations with McCreless and that Speyrer and Joe Williams were socially acquainted. (Def.'s Exh. 45 (includes numerous emails from Speyrer to McDaniel about his business dealings with ACM); J. Williams Test. 6/30; D. Williams Test. 6/30.)  Nevertheless, the evidence before the Court does not indicate that TAA acted in concert with, or purposefully contributed in any way, to Speyrer's burglary and attempted arson of ACM's property.

At trial, TAA made and the Court granted TAA's 52(c) Motion for Summary Judgment on ACM's civil conspiracy charge against TAA, which was based on Speyrer's burglary and attempted arson of ACM's packhouse office.  The motion was granted because the Court found that not even circumstantial evidence indicated a meeting of the minds between Speyrer and any agent of TAA.  Such a meeting of the minds is an essential element of civil conspiracy under Texas law.  ***Murray v. Earle***, 405 F.3d 278, 293 (5th Cir. 2005) (listing a meeting of the minds as one of the elements a plaintiff is required to show to prevail on a civil conspiracy claim). Because the Court found there was no meeting of the minds, it dismissed ACM's civil conspiracy claim.

Thus, ACM's conspiracy claim was dismissed by oral order at trial.  However, ACM's pleadings alleged additional causes of action arising out of Speyrer's conduct.  It thus remains for the Court to determine whether TAA is liable to ACM for Speyrer's conduct through another cause of action.

The Court finds that TAA is not liable to ACM for any harm caused by Speyrer's actions. TAA and Speyrer had no meeting of the minds, agency relationship, or other concert of action or purpose. Therefore, any claims against TAA for trespass, theft liability, or conversion, should fail. As to any misappropriation actions, there is no evidence that TAA has used any information or materials belonging to AMC that it obtained from Speyrer to use. Moreover, it is not clear that the materials taken from ACM's packhouse office are of the kind Texas law seeks to protect. The Court, therefore, finds that it should deny ACM's claims for unfair competition by misappropriation, and misappropriation of trade secrets.

As indicated above, ACM also alleges various causes of action against TAA arising from Speyrer's actions. ACM's pleadings do not offer clear theories of law under which it is entitled to a remedy. For instance, ACM claims that it is entitled to some remedy for theft without explaining to the Court what remedy it seeks in a civil court, and under what legal theory it seeks a remedy. The Court can thus tailor the plaintiff's claims and legal arguments to fit valid causes of action under Texas law.

Such alterations are within the Court's discretion. Rule 8 of the Federal Rules of Civil Procedure applies to an adversary proceeding in Bankruptcy Court. Fed.R.Bankr.P. 7008(a). Rule 8(e) requires the Court to construe pleadings "so as to do justice." Fed.R.Civ.P. 8(e). "This means that federal courts should construe the pleadings in favor of the pleader." *Keim v. City of El Paso*, 1998 WL 792699 *3 (5th Cir. 1998) (citing *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969)). In *Ritchie v. United Mine Workers of America*, "a complaint was deemed sufficient to plead a certain legal theory without ever specifically mentioning that theory, when '[a]ll the necessary averments were present in the complaint to bring [that] claim.'" *Konstantinow v.*

71

*Findlay Ford Lincoln Mercury*, 2006 WL 3299487, *3 (E.D. Mich. 2006) (citing *Ritchie v. United Mine Workers of America*, 410 F.2d 827, 832 (6th Cir. 1969).

Where ACM does not assert a cause of action recognized at law, the Court may construe ACM's allegations liberally, determining what causes of action ACM may pursue given the facts and arguments put forward in its pleadings. The Court should look at the substantive law of Texas to determine where a cause of action may lie. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 77 (1938) (holding that federal courts should apply state substantive law).

In this case, ACM seeks relief for trespass, misappropriation of business information, and theft, arising from Speyrer's conduct. Trespass is a cause of action available at Texas common law. Misappropriation of business information is not a recognized cause of action in Texas courts. Nevertheless, the averments offered thereof may support two related causes of action available in Texas: unfair competition by misappropriation and misappropriation of trade secrets. Under the theft claim, ACM may have intended to seek relief under the Texas Theft Liability Act, or by way of conversion, theft's civil counterpart.

As indicated above, ACM's civil conspiracy claim, which arose out of Speyrer's actions, was dismissed at trial. The Court granted TAA's 52(c) motion for summary judgment on the matter of civil conspiracy upon determining the evidence could not show a meeting of the minds between TAA and Speyrer. The determination that no meeting of the minds took place may foreclose the availability of those claims that require ACM to show TAA is liable for the conduct of a third party.

Actions against TAA for unfair competition by misappropriation and misappropriation of trade secrets should be denied because TAA has failed to show that what Speyrer took from

ACM is protected under these causes of action, and additionally has failed to show or assert that TAA has used whatever materials or documents it acquired from Speyrer.

For the reasons stated below, the Court finds that all ACM's claims against TAA arising out of Speyrer's actions, including ACM's claim of trespass and theft, and any claims for conversion, unfair competition by misappropriation, and misappropriation of trade secrets should be denied.

The Court's granting TAA's 52(c) Motion for Summary Judgment has preclusive effect on some of ACM's other claims arising out of Speyrer's actions. As noted above, the Court granted TAA's 52(c) Motion denying ACM's civil conspiracy claim because there was no meeting of the minds between Speyrer and TAA. The Court's determination that there was no meeting of the minds between Speyrer and TAA toward the object of breaking into ACM's packhouse office and stealing business documents bars ACM from further litigation as to claims of trespass, conversion, and liability under the Texas Theft Liability Act on res judicata grounds.

The doctrine of res judicata dictates that once an issue is decided on the merits, that issue is precluded from further dispute between those parties. "Issue preclusion bars successive litigation on 'an issue of fact or law' that 'is actually litigated and determined by a valid and final judgment, and . . . is essential to the judgment.'" *Bobby v. Bies,* 129 S.Ct. 2145, 2152 (quoting Restatement (Second) of Judgments § 27 (1980) (alterations in original)). Although TAA did not raise the doctrine of res judicata as a defense, the Court may invoke res judicata *sua sponte* in the interest of judicial efficiency, when the issue was tried in front of the same Court. *Boone v. Kuntz*, 617 F.2d 435, 436 (5th Cir. 1980) (finding a Court's *sua sponte* dismissal on res judicata grounds permissible although Rule 8(c) of the Federal Rules of Civil Procedure designates res judicata as an affirmative defense). Additionally, summary judgments have collateral estoppel,

effect. ***Exhibitors Poster Exhange, Inc. v. National Screen***, 421 F.2d 1313, 1318 (5th Cir. 1970) (rejecting appellant's argument that summary judgments cannot have collateral estoppel effect). Thus, this Court's determination that no meeting of the minds between TAA and Speyrer with the object of inflicting harm upon ACM took place has preclusive effect on any claims requiring the movant to establish such a meeting of the minds.

It now remains for the Court to decide which of ACM's claims are precluded by the Court's prior determination that there was no meeting of the minds in order to avoid revisiting an issue that is res judicata.

1.   <u>Trespass.</u>

ACM brought a claim against TAA for trespass onto ACM's lawfully possessed property, asserting that "as TAA's agent, Mr. Speyrer intentionally and voluntarily broke into and entered [ACM's] property causing extensive damage to the property."

To show trespass under Texas law, ACM must show (1) ACM owns or has a lawful right to possess real property; (2) the relevant party physically, intentionally and voluntarily entered the land; and (3) the entry caused damage**. *Stukes v. Bachmeyer***. 249 S.W.3d 461, 465 (Tex. App.—Eastland 2007, reh'g overruled) (listing the elements of a cause of action for trespass under Texas law).

Under Texas law, a party need not personally participate in the physical trespass to incur liability; "one who aids, assists, or advises a trespasser in committing a trespass is equally liable with him who does the act complained of." ***Kirby Lumber Corp. v. Karpel***, 233 F.2d 373, 374 (5th Cir. 1956) (quoting ***McDaniel Bros. v. Wilson***, Tex. Civ. App., 70 S.W.2d 618, 621); ***Schievink v. Wendylou Ranch, Inc***., 227 S.W.3d 862, 865 (Tex. App.—Eastland 2007, pet. denied).

The Court's determination that no meeting of the minds occurred between TAA and Speyrer precludes a finding that TAA is liable for Speyrer's trespass onto ACM's property. This finding also precludes a subsequent finding that TAA aided, assisted, or advised Speyrer in committing a trespass. Additionally, the finding that there was no meeting of the minds as to Speyrer's course of action, or to the object of entering ACM's property to appropriate ACM's business documents precludes the Court from finding that TAA aided, assisted, or advised Speyrer to trespass onto ACM's property.

Of course, a meeting of the minds is not identical to aiding, assisting, or advising to trespass. The Restatement of Judgment instructs that:

> "[w]here there is a lack of total identity between the particular matter presented in the second action and that presented in the first, there are several factors that should be considered in deciding whether for purposes of [issue preclusion] the 'issue' in the two proceedings is the same, for example: Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first? [….] Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second? How closely related are the claims involved in the two proceedings?" Restatement of Judgment § 27, Comment *c* (1982).

Applying the factors suggested in the Restatement here, the Court finds that issue preclusion is appropriate. First, there is substantial overlap between the evidence and argument to be advanced: the trespass and Speyrer's conduct while trespassing was the basis of the civil conspiracy claim, and TAA's connection to Speyrer's trespassory conduct was fully litigated. Second, discovery and pretrial preparation relating to the issue of a meeting of minds for civil conspiracy can be expected to embrace the matter of whether TAA aided, assisted, or advised Speyrer to trespass: any evidence that would support one would support the other. Finally, the two claims are very closely related: the claims seek to assign liability to TAA for the same conduct under two different causes of action, and it would be illogical to conclude that TAA had

aided, assisted, or advised Speyrer in trespassing on ACM's land without a meeting of the minds as to the object of the trespass against ACM.

Even if the Court did not deny ACM's trespass claim through issue preclusion, there is not sufficient evidence to show that TAA aided, assisted, or advised Speyrer to enter ACM's property. Joe Williams testified that he had no knowledge of where Andrew Speyrer went after leaving his house the night of the trespass, and had no knowledge of the wrongs Speyrer was going to commit against ACM. (*See* J. Williams Test. 6/30.) David Williams testified that he wanted nothing to do with Speyrer, and knew him only as a disgruntled client of ACM. (D. Williams Test. 6/30.) Aside from the circumstance that Speyrer was with Joe Williams before burglarizing ACM's packhouse office, and then called Joe Williams from jail some days after being arrested, ACM offers no evidence that TAA aided, assisted, or advised Speyrer in trespassing.

It appears from the pleadings that ACM sought relief from TAA for trespass under a theory of agency. While there are Texas cases from the early twentieth century permitting trespass actions against a defendant based on the defendant's liability as a principal, it is not clear that suing for trespass under general agency principals is proper. *See generally **Alexander v. St. Louis Southwestern Ry. Co. of Texas***, 57 Tex. Civ. App. 407, 122 S.W. 572 (Tex. App. 1909, reh'g denied) (acknowledging that a railroad company could be found liable for the trespass of an agent employed to investigate the plaintiff's spouse although the company had not expressly authorized the trespass); ***Jesse French Piano & Organ Co. v. Phelps***, 47 Tex. Civ. App. 385, 105 S.W. 225 (Tex. App. 1907, no writ) (finding the piano company liable for the harm done by the trespass on plaintiff's property done by its local agent acting under the instructions of its general manager). Moreover, these cases are distinct from the instant case in

76

that Speyrer was not acting as an employee of TAA or as an independent contractor acting within the scope of his obligations when he trespassed on ACM's property, whereas the defendants in both *Alexander* and *Jesse French Piano* had the trespasser under their employ at the time of the trespassing.  Thus, trespass on a theory of agency should be denied.

Therefore, because TAA did not aid, assist, or advise Speyrer to enter ACM's property, TAA is not liable to ACM for Speyrer's trespass.

2.    <u>Theft</u>.

ACM claims that TAA is liable for theft because "Mr. Speyrer – acting on behalf of or at the behest of TAA . . . examined and/or removed ACM's business records."  Under Texas law, a party can incur civil liability for theft under Texas Civil Practice and Remedies Code Chapter 134, commonly known as the Texas Theft Liability Act.  Tex. Civ. Prac. & Rem. § 134.001.  The relevant statute provides: "A person who commits theft is liable for the damages resulting from the theft."  Tex. Civ. Prac. & Rem. § 134.003.  "Theft" is defined for the purposes of the Texas Theft Liability Act as "unlawfully appropriating property or unlawfully obtaining services…."  Tex. Civ. Prac. & Rem.§ 134.002(2).

Therefore, excluding some situations not pertinent here, where a party is culpable for theft under the Texas Penal Code, that party is liable under the Texas Theft Liability Act.  The Texas Penal Code states that "a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both."  Tex. Penal Code § 7.01(a).  The Code provides the ways in which a party may be criminally responsible for the conduct of another, one of which is relevant to the case at hand.  Tex. Penal Code § 7.02.  TAA may be criminally responsible for theft if TAA "acting with intent to promote or assist the commission of the offense, … solicits, encourages,

directs, aids, or attempts to aid the other person to commit the offense." Tex. Penal Code § 7.02(a)(2).

On the other hand, a meeting of the minds for civil conspiracy is specifically the meeting of the minds to achieve an unlawful object or course of action. ***Insurance Co. of North America v. Morris***, 981 S.W.2d 667, 674 (Tex. 1998). The meeting of the minds requirement encompasses all the available ways that TAA could be held liable for Speyrer's theft. It seems impossible to somehow find that TAA solicited, encouraged, directed, aided, or attempted to aid Speyrer without getting together with him and meeting towards a common nefarious goal. Because this Court has already determined that no such meeting of the minds existed, the issue of whether TAA aided Speyrer in any way is precluded. Therefore, without the ability to show that TAA could be criminally liable for Speyrer's actions, ACM cannot recover for its theft claim.

Even if the Court does not deny ACM's claim under the Texas Theft Liability Act on the basis of issue preclusion, there is not sufficient evidence on the record that TAA has any criminal responsibility for Speyrer's theft of ACM's documents. As noted above, Joe Williams testified that he had no knowledge regarding Andrew Speyrer's whereabouts after leaving his house the night of the trespass, and had no knowledge of the wrongs Speyrer was going to commit against ACM. (*See* J. Williams' Test. 6/30.) Likewise, David Williams testified he wanted nothing to do with Speyrer, and understood that Speyrer was not in business of any kind with TAA. (D. Williams Test. 6/30.) No evidence was presented to show TAA solicited or aided Speyrer. Because no evidence was given to hold TAA criminally liable for Speyrer's actions, the Court finds that TAA did not commit theft as defined by the Texas Penal Code and therefore TAA could not incur liability under the Texas Theft Liability Act.

3.    Conversion.

Read liberally, ACM's counter-claim against TAA for theft could also be altered into a conversion claim.  As mentioned above, to prove conversion ACM must show (1) ACM had legal possession of, or was entitled to, possession of the property; (2) TAA assumed and exercised dominion and control over the property in an unlawful and unauthorized manner to the exclusion of, and inconsistent with, ACM's rights; and (3) TAA refused ACM's demand for return of the property. *Crockett*, 257 S.W.3d at 416. Demand and refusal is not necessary when the possessor's acts manifest a clear repudiation of the plaintiff's rights. *Cass*, 156 S.W.3d at 61.

To hold TAA liable for Speyrer's conversion of ACM's property, ACM must show that Speyrer was acting as TAA's agent when Speyrer took ACM's documents from the packhouse office. *Nahm v. J.R. Fleming & Co.*, 116 S.W.2d 1174, 1176 (Tex.App.—Eastland 1938).  This requires ACM to demonstrate: (1) a consensual relationship between Speyrer and TAA whereby Speyrer acts on behalf of TAA, subject to TAA's control; (2) a meeting of the minds between TAA and Speyrer to establish the relationship; and (3) some act constituting the appointment of Speyrer as TAA's agent.  *Lone Star Partners v. NationsBank Corp.*, 893 S.W.2d 593, 599-600 (Tex.App.—Texarkana 1994, writ denied).

Although agency requires a meeting of the minds, it is not the same meeting of the minds as required for a conspiracy claim.  The meeting of the minds required to show agency is a meeting of the minds to establish an agency relationship between two parties. *Id.* at 599-600.  A meeting of the minds for civil conspiracy, on the other hand, requires a meeting of the minds to achieve an unlawful object or course of action. *Insurance Co. of North America*, 981 S.W.2d at 674.  Therefore, the finding that there was no meeting of the minds between Speyrer and TAA to act unlawfully does not preclude a finding that there was a meeting of the minds between

79

Speyrer and TAA to establish a relationship in which Speyrer would act as an agent on TAA's behalf.

Nevertheless, the evidence in front of the Court is not sufficient to show agency. There is no indication that Speyrer was acting on behalf of TAA, or subject to TAA's control, or that there was a meeting of the minds to establish an agency relationship. First, agency requires a consensual relationship between the parties. *Insurance Co. of North America*, 981 S.W.2d at 674. An agency relationship almost certainly did not exist here. David Williams testified that he wanted nothing to do with Speyrer. (D. Williams Test. 6/30.) Joe Williams testified that he tried to keep Speyrer from visiting him, and that after making him clean the mess he had made in Williams' office, Williams told Speyrer, "don't let the door catch you in the butt" as he left, and was relieved when he was gone. (J. Williams 6/30.) Second, a showing of agency requires a meeting of the minds to establish an agency relationship. *Insurance Co. of North America*, 981 S.W.2d at 674. In their testimony, both Williams brothers denied that Speyrer was engaged in any business with TAA. Finally, ACM must show some act constituting the appointment of Speyrer as TAA's agent. *Insurance Co. of North America*, 981 S.W.2d at 674. ACM alleges no such act. Moreover, there is no evidence of any such act.

Because the evidence indicates that Speyrer was not acting as TAA's agent, TAA is not liable for conversion of ACM's documents.

4.    Misappropriation Of Business Information.

ACM argues that TAA misappropriated proprietary business information when Mr. Speyrer broke into ACM's packhouse office and removed business records and other documents containing confidential and valuable information. ACM asserts that it "expended large sums of time and money" developing the information contained in the business records that were stolen, that those business records were "invaluable" to them, that TAA "stood to profit greatly" from

the information, and that it was highly unlikely TAA could duplicate the information through its own independent efforts.

While Texas courts have not recognized "misappropriation of business information" as a valid cause of action, ACM's averments may be molded into a claim for unfair competition by misappropriation, which is recognized under Texas law. *Gilmore v. Sammons*, 269 S.W. 861, 863 (Tex. Civ. App. 1925) (adopting the federal common law doctrine of unfair competition by misappropriation, first established by *Int'l News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68 (1918)).  To prevail on an action for unfair competition by misappropriation, also known simply as misappropriation, ACM must show (1) ACM's creation of a product through extensive time, labor, skill and money; (2) TAA's use of that product in competition with ACM, thereby gaining a special advantage in that competition, that is a "free ride" because the TAA is burdened with little or none of the expense incurred by ACM; and (3) commercial damage to ACM.  *Guy Carpenter & Co., Inc. v. Provenzale.*, 334 F.3d 459, 467 (5th Cir. 2003) (setting forth the elements a plaintiff must show to prevail on a claim for misappropriation of trade secrets under Texas law).

The first element requires an expenditure of extensive time, labor, skill, *and* money. Although ACM alleges in its pleadings that the materials misappropriated were created through an extensive expenditure of time and money, the pleadings do not speak directly to labor or skill. With some leniency, one may infer the expenditure of labor and skill, from ACM's insistence that TAA could not duplicate the information on its own, and that the information was "invaluable" to ACM.  In addition to these expenditures, the first element requires the manufacture of some product.  This product need not be tangible, but it must provide some commercial advantage: "[a] complainant has a protectable property interest in the product of his

81

labor, regardless of subject matter, so long as that matter confers on him a commercial advantage." ***U.S. Sporting Products, Inc. v. Johnny Stewart Game***, 865 S.W.2d 214, 219 (Tex.App.—Waco 1993, writ denied).   Although ACM characterizes the documents as "invaluable" to ACM, it does not indicate the source or nature of this value.  In fact, there is no characterization or specific description of what "product" ACM seeks to protect.  Without any indication of what product ACM seeks to protect, the Court cannot evaluate whether the product offered either party a commercial advantage.  Among the documents Speyrer produced to TAA are a business plan developed for ACM, sales contracts, internal communications, numerous scientific reports regarding the efficacy of ACM's brucitic marble compound as a repellant against various insects, marketing materials, online order forms, and other documents pertaining to a business engaged in marketing and selling a brucitic marble compound as an organic insect repellant.  (*See* Def.'s Exh. 44.)  These documents appear to be an assortment of documents pertaining to the businesses of ACM and Intela-Rid, LLC, which is Speyrer's company, and appear to have no intrinsic value.  ACM has not shown that the hodgepodge of documents Speyrer produced to TAA is the sort of product the unfair competition by misappropriation cause of action seeks to protect.

The second element requires ACM to show that TAA has used the misappropriated product in competition with TAA.  Here, ACM neither avers nor shows that TAA has used the documents it received from Speyrer at all, let alone in competition with ACM.  Joe Williams testified that Speyrer produced the documents to McDaniel, and it is not clear where the documents went following their production to TAA through McDaniel.  (J. Williams Test. 6/30.)

The third element requires that the misappropriation caused ACM to be harmed.  While ACM alleges harm, it produces no specific evidence to support this assertion.

Because ACM has failed to prove its claim for unfair trade by misappropriation, the Court denies its claim for unfair competition by misappropriation.

     5.    <u>Misappropriation Of Trade Secrets</u>.

ACM characterizes the information Mr. Speyrer took from the packhouse office as "trade secrets and/or proprietary data." The Court therefore may mold the misappropriation of business information into a misappropriation of trade secrets claim.

To show TAA is liable for Misappropriation of Trade Secrets under Texas law, ACM must show (1) that a trade secret exists; (2) that the trade secret was acquired through breach of a confidential relationship or by improper means; (3) that TAA used the trade secret without authorization from ACM and with knowledge that it constituted a trade secret. General Universal Systems, Inc. v. HAL, Inc., 500 F.3d 444, 449 (5th Cir. 2007) (listing the elements needed to establish the injury of trade secret misappropriation under Texas law).

Under Texas law, a trade secret is defined as "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *CQ, Inc. v. TXU Min. Co*., LP, 565 F.3d 268, 274 (5th Cir, 2009) (quoting *Computer Assoc. Int'l Inc. v. Altai, Inc*., 918 S.W.2d 453, 455 (Tex. 1996)). The Court in *CQ, Inc* further explained that a trade secret "differs from other secret information in a business in that it is not simply information as to single or ephemeral events in the conduct of business." *Id.* (quoting *Restatement of Torts* § 757, cmt. b). This seems to indicate that not all secret information used in a business qualifies as a trade secret for the purposes of this cause of action. The information Speyrer took from ACM's packhouse was variously called "proprietary business information," "business records," "confidential documents," and "trade secrets" in ACM's filings with this Court. ACM offers no more precise description of how these records or documents were used by ACM, or could be used by TAA.

As described above, the documents Speyrer produced to TAA contained ACM's business plans, reports of scientific studies done on the efficacy of brucitic marble on repelling various kinds of insects, promotional information about ACM and about Intela-Rid, forwarded email communications between Speyrer and McCreless, and various drafts of contracts between ACM and Intela-Rid, and between ACM and Nix, Ltd.  (*See* Def.'s Exh. 44, 45.)  These documents do not convey a "formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it."  Instead, the documents are merely an assortment of documents that are unrelated to one another, aside from the fact that they all pertain generally to ACM's business activities, and do not amount to "trade secrets" under Texas Law.  Therefore, ACM has failed to show TAA misappropriated trade secrets.

It is possible that the "secret" ACM hoped to protect was brucitic marble's use as an insect repellent, but ACM's bare hope does not cause the documents to meet the legal definition of "trade secret."  Misappropriation of trade secrets protects previously unknown formulas, patterns, devices, or compilations, and not previously unknown facts or uses.  *See CQ, Inc.,* 565 F.3d at 274.  Moreover, ACM was actively and openly marketing their brucitic marble compound as an insect repellent, and Speyrer must have known of its use as an insect repellent without relying on any business documents, for he negotiated a contract with ACM to buy the brucitic marble compound from ACM and then sell it to various purchasers in Louisiana as an insect repellent.  (*See, e.g,* Def.'s Exh. 44, p. 06895.)

Additionally, a cause of action for misappropriation of trade secrets requires a showing that the claim defendant has used that trade secret without authorization.  Here, there is no evidence, and ACM does not argue, that TAA has used the information Speyrer produced to it.

Thus, the Court denies ACM's claim for misappropriation of trade secrets.

## VI.

### SUMMARY

For the reasons stated above, the Court finds that the April 2, 1999 Letter Agreement is not an enforceable contract. The Court also finds that TAA's fraud, accounting, tortious interference, and negligence claims should be denied. As to TAA's unjust enrichment cause of action, the Court finds that it should be granted. In compensation for ACM's unjust enrichment, the Court finds that TAA is entitled to recover damages in the amount of $7,125,073.08. Further, the Court finds that TAA's conversion cause of action should be granted. Nevertheless, the court also finds that TAA's damages in relation to ACM's conversion are incorporated in the damages awarded for ACM's unjust enrichment, and TAA cannot recover additional damages for conversion. Similarly, the Court finds that TAA's trespass cause of action should be granted, but damages in relation to ACM's trespass are incorporated in the damages awarded for ACM's unjust enrichment, and TAA cannot recover additional damages for trespass.

As to ACM's counterclaims, the Court finds that its breach of contract claim as to both the Letter Agreement and Mine Mill Site Lease, tortious interference, wrongful eviction, fraudulent misrepresentation and inducement, fraud by non-disclosure, trespass/misappropriation of business information, theft, trespass on defendant's property, and theft of defendant's mineral property claims should be denied. The Court also finds that ACM's detrimental reliance/promissory estoppel claim should be granted and that ACM is entitled to recover $75,000 from TAA as reliance damages. The Court finds that all other relief requested by the parties should be denied.

# # #